(No. 60053.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HUBERT ALMO, Appellant.

*Opinion filed May 24, 1985.—Modified on denial of rehearing September 27, 1985.*

Steven Clark, Deputy Defender, and Richard F. Faust, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Michael E. Shabat and Karen C. Wirth, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SIMON delivered the opinion of the court:

The defendant, Hubert Almo, appeals from his conviction in the circuit court of Cook County of murder and armed violence and his concurrent sentences of 30 and 20 years, respectively, for those two crimes. The appellate court affirmed the defendant's conviction and

sentence for murder and vacated his conviction and sentence for armed violence (123 Ill. App. 3d 406). We granted the defendant's petition for leave to appeal to this court (87 Ill. 2d R. 315).

On March 9, 1979, at approximately 9:15 p.m., Rick Bynum, a full-time security guard at the YMCA hotel, was playing cards in the library of the hotel which was then located on South Wabash Avenue in Chicago. Bynum was off duty at the time. The defendant entered the room and killed Bynum with a single bullet from the defendant's .44 magnum revolver. The police found no gun on Bynum's body. Conflicting accounts of the remaining facts were presented by the State's witnesses and by the defendant, who testified in his own behalf.

The State's version of the case was largely presented by Sandy Russell, Stephen Murchison, and Janie Boyd, all of whom were nearby in the YMCA when the shooting occurred, but not in the same room. Russell and Murchison each testified that they were sitting in the YMCA lobby talking to each other when a black man wearing a white coat and a black hat walked past them into the next room and stood by a table where some people were playing cards. About 5 to 10 minutes later they heard a shot and they dropped to the floor. A few minutes later the same man passed them, placing a gun in his pocket and calmly walking out as though nothing had happened. Murchison testified that he ran into the library after he heard someone say that a security guard had been shot.

Janie Boyd testified that she was playing cards in the YMCA lobby, on the other side of an open doorway to the room in which Bynum was playing cards with three other people; two more people were standing around. She saw the defendant walk in. She next heard a commotion and saw Bynum stand up, apparently trying to pull the table up with him. She then heard a single gun-

shot, and Bynum fell to the ground. Then according to Boyd, the defendant knelt next to Bynum and said, "Get up you coward, get up because I ain't done anything to you yet. Get up you coward [obscenity], get up because I ain't did anything to you." When Bynum did not get up the defendant turned and walked away.

None of the persons in the room where the shooting occurred testified. A police officer testified that when he arrived at the scene defendant was walking out of the building. The defendant offered no resistance.

The defendant's version of events was different. According to him, Bynum's reputation for violence, his prior threat to kill the defendant, and his actions on the night of the shooting caused the defendant to believe that his life was in immediate danger, and to shoot Bynum in self-defense.

The defendant had been a resident of the YMCA since 1972 and was still living there when the shooting occurred. He was employed as a full-time security guard for Andy Frain and a part-time security guard at the YMCA and was licensed to carry a gun. He first met Bynum approximately three months before the shooting when Bynum began working at the YMCA. One day, when the defendant was drinking coffee in the YMCA cafeteria, Bynum told him to "go catch some air," which apparently meant to leave the building. When the defendant did not leave, Bynum called the police and had him arrested. The defendant spent the night in jail charged with disorderly conduct, but when Bynum did not appear to press charges the next morning, the defendant was released. The next day, Bynum told the defendant to move out of the hotel. He told the defendant that he could be on the first floor of the YMCA, but "if I catch you higher than the first floor I am blowing your head off." The defendant testified that it was his understanding that YMCA security guards were re-

quired to carry their guns when they were on the hotel premises and that whenever the defendant saw him, Bynum was carrying a gun.

At the time of Bynum's alleged threat the defendant's rent was paid up, and he did not move out. The defendant testified that on another occasion before the shooting he watched Bynum beat up a blind man on the first floor of the YMCA. According to the defendant, Bynum claimed that he had earlier caught the blind man attempting to break into someone's room with a screwdriver.

On March 9, the defendant returned home to the YMCA after window shopping in downtown Chicago. He went up to the second floor, where he saw Bynum sitting at a table with some women. According to the defendant, Bynum said, "Here, this nigger is here," the defendant answered, "Hey man, why don't you leave me alone," and Bynum replied, "What did I tell you?" Next Bynum told a girl sitting near him to move and, when she did not, he shoved her out of her chair onto the floor. Bynum jumped up. The defendant, trying to defend himself, shot once. He then walked downstairs to the YMCA switchboard, picked up the phone, and reported to the police that he shot someone.

The defendant testified that he saw Bynum wearing a gun at 9:15 p.m. on the evening that the defendant shot him. The defendant further testified that, contrary to what Janie Boyd claimed, he did not follow Bynum, and he did not say anything to him after he shot him. At the close of the evidence, the defendant moved for a directed verdict, contending that he had not been proved guilty beyond a reasonable doubt. The circuit judge reserved his ruling.

The jury was provided with verdict forms for the charges of voluntary manslaughter, murder, and armed violence. During the deliberations, the jury foreman sent

a note asking, "Do we have to find innocent or guilty on all three charges, or are two enough?" The circuit judge sent the following instructions:

> "A verdict of either guilty or not guilty should be returned on the armed violence charge. If you find the Defendant guilty of the murder charge then you need not return a verdict on the voluntary manslaughter charge. If you find the Defendant guilty of the voluntary manslaughter charge, then you need not return a verdict on the murder charge. If you find the Defendant not guilty of both the murder and the voluntary manslaughter charges then you must sign both of these verdicts not guilty. If you find the Defendant not guilty of both the murder and the voluntary manslaughter charges, then you must sign a not guilty verdict on the armed violence charge."

The jury deliberated further and then returned three verdicts, guilty on each of the three charges of voluntary manslaughter, murder, and armed violence. The defendant moved for a mistrial, or in the alternative, for entry of the verdict on the voluntary manslaughter charge only, claiming that verdict indicated that the jury concluded that the defendant believed that he was acting in self-defense, although his belief was unreasonable. The motion was denied. The trial court changed the word "need" to the word "must" in the quoted instruction above and submitted the new instruction to the jury, together with new verdict forms for both murder and voluntary manslaughter, and charged the jury to continue to deliberate. The circuit judge did not submit new verdict forms for armed violence.

The jury then returned a verdict of guilty of murder; no verdict was returned for voluntary manslaughter. The defendant moved for judgment notwithstanding the verdict, but this motion and the reserved motion for directed verdict were denied. Although the appellate court affirmed the conviction of murder, the conviction of

armed violence was vacated because it stemmed from the same acts as the murder conviction.

The major issue on which the defendant appeals is whether the circuit judge erred in submitting new verdict forms for murder and manslaughter after the jury returned verdicts of guilty on both counts. The defendant urges here, as he did below, that the jury's finding of guilty on the voluntary-manslaughter count necessarily means that the jury found that the defendant believed that he was acting in self-defense when he shot Bynum, although the jury must also have found that the defendant's belief was unreasonable. Therefore, the defendant argues, the verdict of guilty of murder, which cannot be based upon the mental state of a genuine but unreasonable belief of self-defense, must be vacated. (*Cf. People v. Fox* (1983), 114 Ill. App. 3d 593; *People v. Stuller* (1979), 71 Ill. App. 3d 118 (Illinois appellate court cases which held that, where a jury returned verdicts of guilty of voluntary manslaughter and of murder, judgment must be entered on voluntary manslaughter and vacated on murder).) The defendant argues that the situation is further complicated by the jury instruction for murder which was given in this case.

We have recently addressed similar but distinguishable issues involving murder and voluntary manslaughter verdicts. In *People v. Hoffer* (1985), 106 Ill. 2d 186, using a different instruction for murder, the jury returned verdicts of guilty of both murder and voluntary manslaughter, and the trial court entered both verdicts. We concluded that the two verdicts were both legally and logically inconsistent and therefore remanded the case for a new trial. See also *People v. Frias* (1983), 99 Ill. 2d 193, 203; *People v. Hairston* (1970), 46 Ill. 2d 348, 361 (where verdicts are inconsistent, the proper remedy is reversal and a new trial).

If the circuit judge in this case had entered the guilty

verdicts for both murder and voluntary manslaughter, *Hoffer* would control. However, in this case, although verdict forms were returned by the jury, they were not accepted by the judge and the inconsistent verdicts were never entered. The defendant argues in effect that the trial was over the moment the verdict forms were returned by the jury with the word "guilty" written on the voluntary-manslaughter verdict form, and that anything that took place thereafter was a nullity.

That is not the law in Illinois.

"The finding of a jury does not become a verdict until it has been received, accepted by the court and entered of record. [Citations.]" (*People v. Wilson* (1972), 51 Ill. 2d 302, 309.) The principle of *People v. Wilson* applies to this case. The trial judge is responsible for the conduct and progress of the trial through all of its stages, from pretrial through final recording of the verdict. When the jury has reached a verdict, the jury foreman tenders the verdict forms to the trial judge. It is then his duty to review the verdict and to determine whether it is proper in both form and substance. In this case, the trial judge received the verdicts and, upon reading them, realized that the convictions of murder and voluntary manslaughter were inconsistent.

At this point, the duty of the circuit judge was to preserve the integrity of the trial. We know from *People v. Hoffer* that had the trial judge accepted both the voluntary manslaughter and murder verdicts, he would have been in error, and eventually the defendant would have been given a new trial at considerable expense to the State and inconvenience to all. In this case, the trial judge avoided that difficulty by sending the jury back to continue its deliberations. He had no choice. Since the two verdicts were legally inconsistent, he could not enter judgment on one and vacate the other. He had no way of knowing which of the two verdicts was intended by the

jury and which was a result of some misconception. If the judge entered judgment on murder and vacated the voluntary-manslaughter conviction, he risked convicting the defendant of more than the jury intended. On the other hand, if he entered judgment on voluntary manslaughter only, he might be acquitting the defendant of murder contrary to what the jury had in fact found. In a jury trial, it is the jury's duty to determine innocence or guilt in accord with the law. The court could not usurp that jury function by second-guessing what the jury really meant.

In this case, it was clear that the jury had misunderstood the trial judge's written answer to the jury's question. By its two verdicts the jury indicated its belief that it was legally possible to convict the defendant simultaneously of murder and voluntary manslaughter based upon the same acts. The obvious way to correct this misapprehension was for the trial judge to do precisely what he did, *i.e.*, change the instruction to read that an individual convicted of one crime "must" not also be convicted of the other. We find the court's action in this case to be both sensible and practical and clearly not an error.

The defendant also urges that the omission of the so-called "fourth proposition" from the murder instruction was an error which caused either the original return of guilty verdicts for both murder and voluntary manslaughter, or the ultimate conviction of murder, or both. The missing words were part of Illinois Pattern Jury Instruction (IPI), Criminal, No. 27.01 (1968), at the time of the trial:

> "To sustain the charge of murder, the State must prove the following propositions:
>
> * * *
>
> *Fourth*: That the defendant did not believe that circumstances existed which justified the use of the force

which he used."

Without this proposition included, the defendant argues that the jury did not realize that the mental states for murder and voluntary manslaughter are inconsistent, and therefore was likely to return convictions on both counts. In *People v. Hoffer* (1985), 106 Ill. 2d 186, however, the fourth proposition was included, and the jury still returned guilty verdicts on both the voluntary-manslaughter and murder counts. We therefore regard the defendant's argument as speculative. The defendant further suggests that without the fourth proposition the two guilty verdicts were both logically and legally consistent, and therefore the trial judge was obligated to enter judgment on voluntary manslaughter and vacate the murder conviction. We do not agree. Although the jury may have initially been confused, the trial judge's additional instruction alleviated the problem before any verdicts were entered. Only one verdict was entered in this case, not two, and therefore we need not address the issue whether two verdicts were legally consistent without the fourth proposition. The defendant emphasizes *People v. Stuller* (1979), 71 Ill. App. 3d 118, where our appellate court vacated a murder conviction and entered judgment on voluntary manslaughter alone. Without reaching the merits of *Stuller*, we note that *Stuller* is distinguishable. After the *Stuller* jury returned verdicts of guilty of both murder and voluntary manslaughter, the circuit judge entered judgment on murder and vacated the voluntary-manslaughter conviction. Here, as we explained above, the jury was allowed to resume deliberations after clarifying instructions were given to it, and it then returned a single verdict of guilty of murder. In *Stuller*, the circuit judge chose between the verdicts. In this case, the jury was allowed to clarify its own intent.

The defendant's suggestion that this case is con-

trolled by *People v. Thurman* (1984), 104 Ill. 2d 326, lacks merit. *Thurman* held only that where "there is evidence of both recklessness and self-defense in a case involving an involuntary-manslaughter count, the issues instruction for [involuntary manslaughter] must include the lawful-justification phraseology." (104 Ill. 2d 326, 331.) Here, the problem was not with the distinction between the mental states of recklessness and intent which are crucial where an involuntary-manslaughter count is involved. Instead, the issue was the distinction between voluntary manslaughter and murder, where the question is one of belief rather than intent. Any initial confusion which the jury may have suffered on this issue was cured by the trial judge's additional instructions.

Further, this court has often held that error which is not raised at the trial court level is waived. Similarly, a defendant waives objection to jury instructions if he does not object or proffer alternative instructions at trial. (*Auton v. Logan Landfill* (1985), 105 Ill. 2d 537; *People v. Huckstead* (1982), 91 Ill. 2d 536, 543-44; *People v. Roberts* (1979), 75 Ill. 2d 1, 14; *Saldana v. Wirtz Cartage Co.* (1978), 74 Ill. 2d 379.) In this case, the defendant did not object to the murder instruction and did not offer any alternative instruction. For that reason, we hold that any error in the omission of the so-called "fourth proposition" pertaining to the mental state required for murder was waived. Although this court may consider an issue raised on appeal even where the objection has been waived, this procedure is utilized only when the alleged error so affects substantial rights that it rises to the level of "plain error." (*People v. Holman* (1984), 103 Ill. 2d 133, 176-77; *People v. Jackson* (1981), 84 Ill. 2d 350, 359; *People v. Foster* (1979), 76 Ill. 2d 365, 380.) This did not occur in this case, since whatever confusion the instruction might hypothetically have caused was remedied when the trial judge amended the instructions

and returned the jury for further deliberations.

The defendant next argues that his own testimony casts a reasonable doubt on his conviction of murder. As a reviewing court, we are not free to overturn the judgment of the trier of fact unless the evidence fails to prove each element of the crime beyond a reasonable doubt. (*People v. Richardson* (1984), 104 Ill. 2d 8, 13.) That is not the case here. The jury listened to the conflicting reports presented by the defendant and by the succession of witnesses presented by the State. The jury was better able than we to observe the demeanor and sincerity of the witnesses and to judge their credibility. Although the defendant's testimony contradicted that of the State, it was uncorroborated. The State's witnesses were consistent with one another, and with the fact that no gun was found on the decedent's body. Under these circumstances, the jury was free to believe the State's witnesses and to disbelieve the defendant, obviously an interested witness in his own behalf. Since there is evidence in the record which proves defendant's guilt beyond a reasonable doubt, we must allow the jury's verdict to stand.

The defendant next urges that the trial court erred in not allowing defense counsel to impeach Janie Boyd with proof of a prior omission of a material fact. Janie Boyd was interviewed by Investigator John Byrne at the scene on the night of the shooting. Investigator Byrne's report, which was never admitted into evidence, contains no reference to any statement by Janie Boyd that the defendant leaned over Bynum's body or talked to him. The defendant now argues that the trial court's rulings prevented him from completing the impeachment, and that this error requires reversal. Since Janie Boyd was the only witness who claimed to see the defendant stoop down and taunt Bynum after he shot him, and since her testimony directly contradicted that of the defendant,

Boyd's credibility was critical in deciding whether defendant was guilty of voluntary manslaughter rather than murder.

During the cross-examination of Boyd by defense counsel, one of the assistant State's Attorneys requested a sidebar to determine whether the defense would be allowed to ask Ms. Boyd whether she heard the defendant say that he just shot someone. That objection was eventually withdrawn. While the parties were at sidebar, the following colloquy also occurred:

"DEFENSE COUNSEL: As long as we are back here, if we are going to have an objection, I believe there will be an attempt to impeach her by omission of her statement to the investigator.

ASSISTANT STATE'S ATTORNEY: How?

DEFENSE: Of things she said here.

STATE: Well, I put her on, you haven't ask [*sic*] her about it.

DEFENSE: That's why I'm bringing it up. Is there going to be an objection to that, too?

STATE: Such as what?

DEFENSE: I don't have an objection. We are going to ask her if she told the investigators the items she testified here today concerning get up you coward, which is not in the police reports.

THE COURT: That would not be proper impeachment.

DEFENSE: That is impeachment by omission, when she talked to the investigator—

STATE: How do you impeach her from what the investigator puts in his report? It is not her report, it is a summary.

DEFENSE: Then if she said that she told him that.

STATE: Then you have no problem.

DEFENSE: Then we can put him on to say that either she did—

THE COURT: But that is the investigator that is not here. You can't impeach her.

DEFENSE: All right."

When the sidebar ended, one of the defense attorneys resumed cross-examination regarding whether Boyd heard the defendant say "I just shot someone," but never asked Boyd whether she told the police investigators that the defendant bent down and spoke to Bynum after he shot Bynum. Later, when the defense attorney attempted to question Investigator Byrne about what Janie Boyd told him regarding the defendant's statements to Bynum, the assistant State's Attorney pointed out that the defense attorney did not, when cross-examining Boyd, ever ask her what she told the investigator about those statements after the shooting. The circuit judge agreed and sustained the State's objection.

Nothing in the earlier colloquy, as we construe it, prevented defense counsel from questioning Boyd about her statements to the investigator. All the circuit judge said was that Boyd could not be impeached with the report because it was not her statement. Further, defense counsel did not contend, when denied the opportunity to cross-examine Investigator Byrne, that the trial court had prevented them from cross-examining Boyd on this issue, nor did defense counsel ask at any time to recall Boyd so that she could be questioned further and a proper foundation laid for her impeachment. Therefore, we agree with the appellate court that the record does not reflect a proper foundation laid by trial counsel, and that the circuit judge committed no error which requires a new trial. We note also that trial counsel did not raise these alleged errors in their motion for a new trial, and that therefore the objection at this stage is properly considered waived. *People v. Pickett* (1973), 54 Ill. 2d 280, 282.

Finally, the defendant argues that the trial court abused its discretion in sentencing the defendant to 30 years for murder and 20 years for armed violence. Since the conviction and sentence for armed violence were va-

cated by the appellate court, we are concerned here only with the sentence for murder. The 30-year sentence is within the 20- to 40-year range of sentences for murder prescribed by the legislature (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)(a)). The sentence to be imposed in an individual case is left to the discretion of the trial court, after considering the facts and circumstances of the case and the defendant's prior history. A reviewing court will not reduce the sentence unless there is an abuse of discretion. (*People v. Cox* (1980), 82 Ill. 2d 268; *People v. Lykins* (1979), 77 Ill. 2d 35; *People v. Perruquet* (1977), 68 Ill. 2d 149.) We find no abuse of discretion in this case and therefore cannot modify the sentence imposed by the trial court.

For the reasons discussed in this opinion, the judgment of the appellate court is affirmed.

*Judgment affirmed.*