THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELIEZER MASSA, Defendant-Appellant.

First District (3rd Division)   No. 1—91—3183

Opinion filed February 1, 1995.—Rehearing denied March 16, 1995.

Michael Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Defendant, Eliezer Massa, was indicted on three counts of first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(1) (now 720 ILCS 5/9—1(a)(1) (West 1992))), two counts of armed robbery (Ill. Rev. Stat. 1991, ch. 38, par. 18—2(a) (now 720 ILCS 5/18—2(a) (West 1992))), and two counts of aggravated unlawful restraint (Ill. Rev. Stat. 1991, ch. 38, par. 10—3.1 (now 720 ILCS 5/10—3.1 (West 1992))). In addition, he was indicted for a separate residential burglary (Ill. Rev. Stat. 1991, ch. 38, par. 19—3 (now 720 ILCS 5/19—3 (West 1992))) and four separate armed robberies (Ill. Rev. Stat. 1991, ch. 38, par. 18—2 (now 720 ILCS 5/18—2 (West 1992))).

After defendant pleaded guilty to murder, residential burglary, robbery, and four armed robberies, the trial court sentenced him to 70 years' imprisonment for murder on the basis that his participation had been exceptionally brutal and heinous, and concurrent terms of 30 years' imprisonment for the four armed robberies, 15 years' imprisonment for residential burglary, and seven years' imprisonment for robbery.

Subsequently, the trial court denied defendant's motion to withdraw the guilty pleas and vacate the judgments. On appeal, defendant asserts that (1) he was denied his right to effective assistance of counsel because his attorney had a *per se* conflict of interest in that defendant had filed a lawsuit against him in Federal court; (2) he was denied his right to effective assistance of counsel because the

trial court did not alleviate the conflict after being informed of it before trial; and (3) he was denied his right to effective assistance of counsel because his attorney did not review the report of proceedings of the guilty plea prior to the motion to withdraw the guilty plea. For the reasons that follow, we affirm.

After defendant was declared fit to stand trial, Assistant Public Defender James Mullinex informed the court that he wanted to obtain defendant's hospital records and a complete file from the Psychiatric Institute. Defense counsel also informed the trial court that defendant was disappointed with his representation. Through a Spanish-language interpreter, the trial court asked defendant about his concerns regarding his representation. Defendant responded, "No, that's okay. I want you to be my attorney."

On May 9, 1991, attorney Mullinex informed the trial court that defendant was requesting a new attorney and had contacted a private attorney. The trial court granted defendant leave to file a motion for the appointment of new counsel, but deferred his ruling until defense counsel had the opportunity to confer with defendant.

Defendant's jury trial was set for July 29, 1991. On that date with an interpreter translating for defendant, attorney Mullinex informed the trial court that defendant had filed a lawsuit against him in Federal court. Nevertheless, defendant wanted to plead guilty and accept the State's new offer. Even though attorney Mullinex informed defendant that there would be a conflict of interest for him to continue to represent him, defendant was willing to plead guilty with attorney Mullinex representing him.

With an interpreter translating, the following discussion occurred:

"THE COURT: Well, Mr. Massa, what do you have to say about that [sic] you have heard what Mr. Mullinex has said? Have you filed a lawsuit against him down in the federal court?

MR. MASSA: Tell him that I want to take the 70 years, but on the condition that Carlo Rodriguez has nothing to do with this case.

THE COURT: I understand that, but what I'd like to know from Mr. Massa is, what is the basis of his complaint against Mr. Mullinex that caused him to file a federal lawsuit against him?

MR. MASSA: I thought that he was not doing anything for me.

THE COURT: Is that because Mr. Rodriguez was involved in these discussions?

MR. MASSA: No, he was not involved in it.

THE COURT: Was his disagreement with Mr. Mullinex based upon his belief that he thought Mr. Mullinex wanted him to testify against Mr. Rodriguez?

MR. MASSA: I don't understand.

THE COURT: Earlier in the case, Mr. Massa was interviewed by the state's attorney with the idea that he might be a witness against some of his co-offenders. Do you recall that?

MR. MASSA: Yes, I remember.

THE COURT: The fact that it was possible that he might be a witness against his co-defendants, is that the basis of the disagreement with Mr. Mullinex?

MR. MASSA: Yes.

THE COURT: He understands now he's not going to be a witness or expected to be a witness against anybody, is that right?

MR. MASSA: Yes.

THE COURT: Because of that or based on that, does that eliminate any disagreement you may have had with Mr. Mullinex?

MR. MASSA: What does that mean, what does it mean? What are you saying?

THE COURT: What I'm saying is now that he knows he's not going to be a witness against any other defendant, does that eliminate any problem or disagreement he may have had with Mr. Mullinex?

MR. MASSA: Yes.

THE COURT: So he's got no other problem with Mr. Mullinex?

MR. MASSA: No.

THE COURT: And was that problem that he thought he did have the reason why he filed the suit down in the federal court?

MR. MASSA: I had the belief that he was not doing something for me, anything for me.

THE COURT: Is he satisfied now, are you satisfied now that Mr. Mullinex is doing something for you?

MR. MASSA: Tell him that, that I'm taking the 70 years, that I'm resigned to it.

THE COURT: I want to know about he [sic] and Mr. Mullinex.

MR. MASSA: Tell him that, that it's all right, that I have nothing against him.

THE COURT: Do you want him to represent you for your guilty plea and sentencing hearing?

MR. MASSA: Yes, tell him yes."

Defense counsel then informed the trial court that defendant wanted to withdraw his not guilty pleas on all charges. Defendant acknowledged that he was entering the guilty pleas with the understanding that he would be sentenced to 70 years' imprisonment. The trial court then admonished defendant regarding his constitutional rights, and defendant asserted that he understood all the admonishments.

The factual basis for each of the indictments was as follows. On September 19, 1990, defendant, Ferdinand Pacheco, and Lazaro Alejandro planned to commit armed robbery in order to get money for drugs. At 7 p.m., the three men armed themselves with handguns and drove to several locations before deciding to rob a grocery store. Defendant and Pacheco entered the store while Alejandro remained in the car as the getaway driver. Acting as a lookout at the entrance, defendant displayed a gun while Pacheco announced the robbery. Pacheco shot and killed Ali Monarz and then took money from the cash register before leaving with defendant. Later that night, the three men divided up the proceeds. After his arrest, defendant confessed to his involvement.

On May 22, 1990, defendant entered a shoestore and announced that he had a gun. He demanded money from the cash register, then dragged one of the employees to the register, forced him to open it, and made him take out all the money. Defendant fled after taking $50. He was later identified in a lineup.

On July 12, 1990, defendant was seen taking a television set from the house of Nidolay Pawlicheko, who knew defendant by name. Because Pawlicheko had not given defendant authority to take the television set, he hollered at defendant, who dropped the television set and ran. Pawlicheko identified defendant at the time of his arrest as the man who took his television set.

There were also four separate armed robbery charges against defendant. At 1:26 p.m. on September 10, 1990, defendant entered a dry cleaning establishment, displayed a handgun, and demanded the clerk's money. He took about $40, a gold chain, and a gold necklace, and then ran. After the clerk positively identified defendant in a lineup, defendant confessed to the crime.

At 1:15 p.m. on September 13, 1990, defendant entered a business office, displayed a handgun, and demanded an employee's money. He took $186 and fled. After the employee identified him in a lineup, defendant confessed to the crime.

At 6:30 p.m. on September 13, 1990, defendant entered a hair salon, placed a knife to the stomach of an employee, and demanded her money. He took $60 from the employee's purse and fled. Defendant confessed to the crime after he was identified in a lineup.

At 10:25 p.m. on September 18, 1990, defendant and Pacheco entered a video store. Defendant was armed with a knife and Pacheco was armed with a shotgun, which he fired into the ceiling. After Pacheco demanded money from the customers and employees, he and defendant took $550, a gold bracelet, a gold watch, and a handgun, and then fled. Subsequently, defendant was identified in a

lineup and later admitted to the crime. The trial court entered guilty findings on all these charges.

On August 27, 1991, during a fitness hearing, Dr. Raphael Carreira, a psychiatrist, testified that he examined defendant on April 3, 1991. Prior to the examination, Dr. Carreira had reviewed defendant's social service psycho-social history, psychological test results, and prior psychiatric reports. After questioning defendant about the nature of the proceedings and roles of those in court, it was Dr. Carreira's opinion that defendant was competent to stand trial. Although defendant was not cooperative during the evaluation, Dr. Carreira concluded that defendant was capable of cooperating with defense counsel if he so wished. Dr. Carreira diagnosed defendant as having a mixed personality disorder with anti-social and dependent traits, but also believed that defendant was malingering since he did not have the usual psychiatric symptoms of poor judgment, bizarre behavior, looseness of association, and a relative openness to answering questions.

On the day of the fitness hearing, Dr. Carreira again spoke to defendant for 30 minutes. During that conversation, defendant would not acknowledge that he knew what the court proceedings were and denied knowledge of filing his lawsuit against his attorney. Dr. Carreira concluded that defendant was still malingering and would be able to cooperate with defense counsel if he so chose. Both of Dr. Carreira's conversations with defendant were in Spanish.

On cross-examination, Dr. Carreira stated that defendant's social history indicated that he had hydrocephalus, which is a collection of liquid that covers the brain and spinal cord. If left untreated, it can either cure itself spontaneously or worsen and lead to death. If left untreated, it can affect a person's physical and psychological functioning.

Next, Dr. Thampy, a psychiatrist, testified that he examined defendant on August 6, 1991. Prior to that examination, Dr. Thampy reviewed Dr. Carreira's reports and defendant's other psychiatric evaluations, police and jail records, and information collected from the social service staff. Those reports included the social history that showed defendant was born with hydrocephalus, a jail staff report that defendant had attempted suicide, and a diagnosis from Cermak Hospital that defendant had a psychosis. Dr. Thampy stated that he unsuccessfully tried to speak to defendant in Spanish because he was extremely erratic and subject to dramatic changes in mood and conduct. Dr. Thampy concluded that defendant was unfit to stand trial because of his inability to cooperate.

Dr. Thampy came to the same conclusion when he spoke to defendant on September 10, 1991, during the fitness hearing. He admitted that he could not give a specific treatment plan since he could not diagnose defendant's mental condition. Because he was not certain that defendant had a mental illness, Dr. Thampy concluded that defendant would benefit from more observation in a psychiatric institution to determine the exact nature of his condition.

On cross-examination, Dr. Thampy testified that there was evidence of malingering. In addition, defendant was able to understand the nature of the proceedings, the functions of various court personnel, and the possible consequences of his actions.

Following arguments, the trial court ruled that defendant was fit at the time he pleaded guilty and for sentencing. The court stated that Dr. Carreira was able to diagnose defendant as malingering and having a mixed personality disorder with anti-social tendencies whereas Dr. Thampy was unable to diagnose defendant's specific mental condition. Concluding that Dr. Carreira's testimony was much more persuasive than Dr. Thampy's, the trial court ruled that defendant was able to cooperate with his attorney, understood the nature of the proceedings in which he had been involved during the past years, and was fit for sentencing. Furthermore, the court found that there was no evidence that defendant had not been fit for trial or to plead guilty.

Attorney Mullinex then moved to vacate the guilty pleas on the ground that defendant was unfit. After the trial court denied the motion, it sentenced defendant to 70 years' imprisonment for the murder, finding that defendant's conduct had been exceptionally brutal and heinous. The trial court also sentenced defendant to 30 years' imprisonment for the four armed robberies, 15 years' imprisonment for residential burglary, and seven years' imprisonment for robbery, all to run concurrently.

On September 19, 1991, defendant filed a *pro se* motion to withdraw his guilty plea, which alleged, "I did not fully understand what I was doing. I do not comprehend English to [*sic*] good. I do not want to plea[d] guilty. I am requesting a jury trial. I did not fully understand I was accepting a 70 year sentence." Attorney Mullinex moved to supplement the *pro se* motion with the fitness issue.

Defendant had told attorney Mullinex that he wanted attorney Mullinex to represent him in the post-trial motion and that he wanted to appeal. After the trial court confirmed that defendant wanted attorney Mullinex to remain as his attorney, attorney Mullinex represented that he spoke with defendant, examined the transcript, and stood on the motion as presented and supplemented.

After reviewing the testimony presented at the fitness hearing, the trial court concluded that defendant presented no adequate ground to withdraw the guilty pleas and vacate the judgements. Subsequently, attorney Mullinex filed a certificate of compliance.

Defendant's first assertion on appeal is that his right to effective assistance of counsel was denied during his guilty plea proceeding because his attorney had a conflict of interest in representing him in the guilty plea proceedings. Defendant contends that a *per se* conflict arose because he had filed a civil lawsuit against his attorney in Federal court. If not a *per se* conflict, defendant argues that reversal of his conviction is necessary without any showing of prejudice because the trial court was made aware of a possible conflict of interest and did nothing to alleviate it.

In response, the State asserts that defendant waived his argument because he did not raise it in his motion to withdraw the guilty pleas and vacate the judgments. Pursuant to Supreme Court Rule 604(d), any issue not raised by defendant in the motion to withdraw the plea of guilty and vacate the judgment shall be deemed waived. 134 Ill. 2d R. 604(d).

Although the issue was not raised in the motion to withdraw the guilty plea, we will consider it under the plain error rule because the claimed error potentially threatens defendant's sixth amendment right to effective assistance of counsel, which is a fundamental right. *People v. Washington* (1984), 101 Ill. 2d 104, 109-10, 461 N.E.2d 393; *People v. Almo* (1985), 108 Ill. 2d 54, 66, 483 N.E.2d 203.

There are three types of conflict of interest cases: *per se* conflict; non-*per se* but potential conflict that is brought to the attention of the trial court at an early stage; and actual conflict of interest. The sixth amendment right to effective assistance of counsel includes the right to have the undivided loyalty of counsel, free from any conflict of interest. *Strickland v. Washington* (1984), 466 U.S. 668, 688, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.

■ We find that defendant's lawsuit against his attorney did not create a *per se* conflict of interest, which exists when the defense counsel has a tie to a person or entity that would benefit from an unfavorable verdict to the defendant. (*People v. Holmes* (1990), 141 Ill. 2d 204, 219, 565 N.E.2d 950.) Generally, *per se* conflicts are created by the defense attorney's prior or contemporaneous association with either the prosecution witnesses or the victim. *People v. Spreitzer* (1988), 123 Ill. 2d 1, 14, 525 N.E.2d 30.

We follow the decisions in *People v. Johnson* (1992), 227 Ill. App. 3d 800, 592 N.E.2d 345, *People v. Arnold* (1991), 218 Ill. App. 3d 647, 577 N.E.2d 1355, and *People v. Hardeman* (1990), 203 Ill. App. 3d 482, 560 N.E.2d 1198, in holding that a lawsuit or Attorney Registration

and Disciplinary Commission claim against a defendant's attorney does not constitute a *per se* conflict. Although a pending lawsuit between a defendant and his attorney may give rise to a conflict of interest requiring appointment of new counsel, a defendant who files a lawsuit against his attorney does not necessarily create such a conflict. (*Arnold*, 218 Ill. App. 3d at 656.) The trial court must consider the nature and gravamen of the defendant's civil lawsuit filed against his attorney to determine whether the action creates the kind of conflict that requires the court to appoint new counsel for the defendant. *Arnold*, 218 Ill. App. 3d at 656-57.

We must next determine whether there was a potential conflict brought to the attention of the court or an actual conflict demonstrated by the performance of counsel at trial. Where there is no *per se* conflict but the trial court is aware of a possible conflict at an early stage, the trial court has a duty to either appoint separate counsel or to inquire whether there is an actual conflict (*Spreitzer*, 123 Ill. 2d at 18). Furthermore, it is the duty of the trial court to determine whether the disciplinary complaint is well founded or merely a frivolous complaint for the purposes of delay or obtaining new counsel. (*Johnson*, 227 Ill. App. 3d at 815.) However, it is the defendant's responsibility to provide the court with legitimate reasons supporting his request for new counsel. *Johnson*, 227 Ill. App. 3d at 815.

In this case, defense counsel alerted the trial court prior to the guilty plea proceedings that there was a potential conflict. The trial court then took adequate steps under the circumstances to ascertain whether there was an actual conflict because of defendant's Federal court lawsuit. Defendant did not show an actual conflict. In fact, the record indicates that defendant claimed that there was no longer a problem with his attorney. Even though the trial court did not explain to defendant how the pending lawsuit could impact his attorney's representation, the basis of the lawsuit had already been resolved in that defendant was not longer being asked to testify against a codefendant.

Since there was no *per se* conflict of interest and the trial court adequately ascertained that no actual conflict of interest existed, we conclude that there was no ineffective assistance of counsel based on a conflict of interest.

Next, defendant asserts that he received ineffective assistance of counsel during his post-trial motion because his attorney did not strictly comply with Rule 604(d) in that he did not read the transcript of all the proceedings, did not ascertain all of defendant's concerns, did not inform defendant that any issues not raised in his motion

were waived for purposes of appeal, and did not amend defendant's *pro se* motion to include ineffective assistance of counsel.

In response, the State contends that defendant waived the Rule 604(d) issue because it was not included in his motion to withdraw guilty plea. We will consider this issue under the plain error rule because the claimed error potentially threatens defendant's sixth amendment right to effective assistance of counsel, which is a fundamental right. *Almo*, 108 Ill. 2d at 66; *Washington*, 101 Ill. 2d at 109-10.

■ Based on attorney Mullinex's representation under oath, we conclude that he strictly complied with Rule 604(d). Attorney Mullinex filed a certificate of compliance, which has not been challenged. In that certificate, he swore on oath:

> "I have personally consulted with defendant, ELIEZER MASSA, concerning his Motion to Withdraw his plea of guilty. I have ascertained his contentions of error in the entry of the plea of guilty. I have examined the trial court file and report of proceedings of the plea of guilty and have made amendments to the motion necessary for adequate presentation of any defects in the proceedings. I have also filed my own Motion to Vacate Plea of Guilty which supplements Mr. Massa's own Motion to Withdraw Guilty plea and to vacate Judgment."

Since Attorney Mullinex strictly complied with the requirements of Rule 604(d), there was no ineffective assistance of counsel.

Based on the foregoing, we affirm the circuit court judgment.

Affirmed.

GREIMAN, P.J., and RIZZI, J., concur.