2019 IL App (2d) 180730-U
No. 2-18-0730
Order filed December 18, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 12-CF-1269 |
| | ) | |
| JAMIE ZARATE,[1] | ) ) | Honorable Clint Hull, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The defendant's convictions of attempted murder were affirmed where the State proved beyond a reasonable doubt that the defendant's principal possessed the specific intent to kill the victims; the defendant actively participated in seating an alternate juror after one of the original jurors became ill during deliberations, so any error in that procedure was invited; any errors in the State's closing argument

_____

[1] Defendant's first name is variously spelled "Jamie" and "Jaime" in the record. When defendant testified, he spelled his name "Jamie" for the record. Also, the court directed the clerk to amend the indictment to spell defendant's first name "Jamie." Accordingly, we use that spelling throughout this order.

were forfeited by defendant's failure to present a cohesive argument with relevant authority pursuant to Supreme Court Rule 341.

¶ 2　　Defendant, Jamie Zarate, appeals his convictions of home invasion (720 ILCS 5/12-11(a)(2) (West 2012)) and attempted first-degree murder (720 ILCS 5/8-4(a) (West 2012)) following a jury trial. We affirm.

¶ 3　　　　　　　　　　　　I. BACKGROUND

¶ 4　　On August 8, 2012, a Kane County grand jury indicted defendant on two counts of home invasion, two counts of attempted first-degree murder, and five counts of aggravated battery (720 ILCS 5/12-3.05(f)(1) (West 2012)). Prior to trial, the State dismissed the aggravated battery counts. The following evidence was adduced at a jury trial in April 2018.

¶ 5　　　　　　　　　　A. The State's Case In Chief

¶ 6　　On June 23, 2012, Melanie Coquillard lived at 404 Raymond Street in Elgin, Illinois, with her boyfriend, Arturo Hernandez, and her five-year-old son, Junior. At 3 a.m. on that date, Coquillard was awakened by the sound of breaking glass. In the living room, she saw defendant and Modesto Rosales kicking their way into the apartment through the front door. Rosales was Junior's father. Coquillard had known defendant for over 5 years.

¶ 7　　Coquillard tried unsuccessfully to push defendant and Rosales out of the house, but they got around her and began punching Hernandez. Coquillard covered Hernandez with her body. Rosales said "I will kill you" as he struck both Coquillard and Hernandez with an iron, a dining room chair, a computer monitor, and a scanner. Coquillard was not sure who Rosales was threatening. (Coquillard previously told the police that the beating was over when Rosales threatened to kill her.) When Junior appeared on the scene, defendant removed Rosales from the apartment.

¶ 8       Hernandez testified that he was awakened on June 23, 2012, by a loud boom, and then he heard glass breaking. He saw defendant and Rosales come "right through" the door into the apartment. Hernandez got Rosales in a headlock, and then defendant punched Hernandez at least twice in the face and told him to "get off his nigger." Hernandez swung at defendant, missed, and then was hit in the mouth with an object that burned. Hernandez went down while defendant continued to punch him with his fists. Hernandez saw Coquillard try to get an iron away from Rosales. She failed, and Rosales hit Hernandez with the iron. Hernandez went in and out of consciousness, but he was aware of defendant hitting him in the face while Coquillard fought with Rosales. Then Hernandez saw Rosales lift a dining room chair over his head. Rosales smashed the chair into Hernandez's head. Defendant was not trying to stop Rosales. Hernandez testified that Rosales then struck him in the face with a computer monitor and a printer.

¶ 9       Then the beating stopped. Hernandez saw Junior in the hallway and "legs running towards the living room" and then "outside the door."

¶ 10      Coquillard and Hernandez suffered multiple cuts and gashes. The first officer on the scene described Hernandez as being bloody from head to toe. Hernandez also had some of his teeth knocked out during the beating. Coquillard and Hernandez were both briefly hospitalized for treatment of their injuries.

¶ 11      At approximately 3:30 that morning, Officer Ramon Lazcano was looking for a black Saab that was reported to have been involved in the Coquillard/Hernandez home invasion. Lazcano eventually stopped the Saab in front of 336 Wilcox, which was Rosales' home. Two men, later identified as Rosales and defendant, got out of the car and started walking up the driveway. Lazcano observed blood on both men. Lazcano ordered them to stop. They looked at the officer

but kept walking. Then defendant ran while Lazcano arrested Rosales as he tried to enter the house through the back door.

¶ 12    Officer Adam Green began chasing defendant. Defendant ran through the backyard, through some bushes, and up and over a fence. Green then assisted Lazcano in arresting Rosales. Other Elgin police officers located defendant underneath a tree and arrested him. The State rested.

¶ 13                           B. Defendant's Case In Chief

¶ 14    After the court denied defendant's motion for a directed verdict, defendant presented his case. Through photographs and police testimony, defendant established that there were no bruises on his hands when he was arrested. Police testimony also established that there was blood inside the passenger area of defendant's Saab but not on the driver's side where defendant had been sitting.

¶ 15    By stipulation, defendant introduced into evidence Junior's prior statement regarding the incident. Junior told an investigator that the household was asleep when the sound of glass breaking woke them. Junior saw some of the fight in the dining room. He stated that he witnessed Rosales strike Coquillard and Hernandez with an iron, a chair, and a computer. Junior further stated that defendant tried to get Rosales to leave the house.

¶ 16    Next, defendant testified that he was 32 years old and worked as a machinist. He lived with his fiancée and his children. Defendant had previously been convicted of felony obstruction of justice and felony theft. On the night of June 22, 2012, defendant and Rosales went out drinking together. After they hit a couple bars, Rosales asked defendant to drive him to Coquillard's apartment. Defendant testified that Rosales seemed "maybe a little sad or upset." There was no discussion of breaking into Coquillard's residence or causing her any trouble. Defendant did not expect Hernandez to be present when they arrived.

¶ 17    Rosales knocked "very heavily" on Coquillard's door, but nobody opened it. Defendant testified that it was "very possible" that "glass broke" but defendant did not remember that "for certain." Defendant stated that he was behind Rosales on the front steps when Coquillard finally opened the door and started yelling at Rosales. Rosales yelled back. Defendant testified that Coquillard and Rosales were arguing about their relationship.

¶ 18    Rosales pushed his way into the apartment, and Coquillard yelled at defendant to get him out of there. Defendant followed Coquillard inside, where Rosales and Hernandez confronted each other. When the confrontation between Rosales and Hernandez became physical, defendant yelled at Rosales "let's go, let's go." Defendant and Coquillard got between the two men and then they all fell to the ground. After that, defendant saw Rosales hit Hernandez with an iron. Then Rosales picked up "many different things." According to defendant, "it was hit and it drops *** and he would pick up something else and it would drop." All this time, defendant was yelling at Rosales to stop. Defendant testified that the evening's alcohol began to wear off, and he was worried about what Rosales was doing.

¶ 19    Then, Junior came into the room. Defendant grabbed Rosales, hit him, and yelled, "Your son's here, man, your son, stop." However, Rosales was throwing furniture through the windows and breaking everything in his path. Defendant forcefully removed Rosales from the apartment.

¶ 20    Rosales then kicked out the windshield of defendant's Saab. Defendant drove to Rosales' home where Rosales headed toward the back, so defendant went that way too. Then defendant ran from the police because he was scared. Defendant testified that, after he was in custody, the police would not allow him to tell his side of the story.

¶ 21                              C. The State's Rebuttal

¶ 22    In rebuttal, the State called Elgin police Detective Tim Marabillas. He interviewed defendant on June 23, 2012, at 12:30 p.m. to allow him "to explain what happened." Marabillas described the first part of the interview as "cordial." The detective testified: "I was allowing [defendant] plenty of opportunity to explain his involvement in what had happened." Defendant told Marabillas that Rosales used a chair on Coquillard's front porch to smash the picture window and then the door. Defendant then stated that Rosales "forced entry" into the residence and defendant went inside with him.

¶ 23    On cross-examination, Marabillas agreed that the tone of the interview changed when Marabillas confronted defendant with the victims' statements that defendant was "not merely present," but that "he had done this."

¶ 24                     D. The State's Closing Arguments

¶ 25    In its opening closing remarks, the State argued that defendant was legally accountable for Rosales' conduct. In discussing the charge of attempted murder, the prosecutor stated: "What's contended or what the defense wants you to believe and what he told you—" His argument was interrupted by defense counsel's objection, which the court sustained. The prosecutor went back to discussing the language of the instructions. Arguing the evidence to support the charges of attempted murder, the prosecutor stated: "[Coquillard] told you, I'm going to kill you, I'm going to kill you. We have what [Rosales] actually says, showing his intent to kill." The defense did not object to that statement.

¶ 26    In rebuttal closing argument, the prosecutor started without objection by saying, "How many people have to lie or are grossly mistaken for the defendant's story to be true?" The prosecutor listed Marabillas, Coquillard, and Hernandez, and then said: "Every witness who had a fact that hurt the defendant must have lied or been grossly mistaken. It's ridiculous. That's the

starting point, it's ridiculous." Defense counsel objected, and the court sustained the objection. Then the prosecutor noted that Junior stated that they were all asleep when they heard glass breaking. "Now," the prosecutor argued, "Junior is a liar too." In response to defendant's objection, the court admonished the jury that it should disregard arguments not based on the evidence. Later, in discussing accountability, the prosecutor argued that defendant "should have been on notice" that the home invasion and beatings were going to happen because Rosales was in a "bad mood" in the car on the way to Coquillard's apartment. Defense counsel objected that the argument misstated the law of accountability, but the court overruled the objection. The prosecutor continued to argue accountability by saying that if defendant had called the police when Hernandez had Rosales in a headlock, no damage would have occurred. Defense counsel objected that there is no legal requirement to stop a crime that is in commission. The court stated that it agreed with defense counsel but disagreed that was what the prosecutor was arguing. The court again admonished the jury that arguments not based on the evidence should be disregarded. The prosecutor returned to the subject of credibility and argued that defendant's testimony that he saw no blood was "truly, truly outrageous." The court sustained defendant's objection that the comment misstated the evidence. In discussing the lack of blood on the driver's side of defendant's Saab and the lack of bruises on defendant's hands, the prosecutor stated: "It doesn't matter, it's a red-herring, a distraction." The court sustained defendant's objection to that remark.

¶ 27                     E. The Replacement of Juror 54

¶ 28    Three hours into the jury's deliberations, Juror 54 complained to the bailiff of feeling "very ill." The judge halted deliberations while the juror was taken out for air. However, the juror was too ill to resume deliberating. The court then advised the parties that it intended to excuse Juror 54

"unless I hear some objection otherwise." The State had no objection. Defendant's attorney stated: "Judge, based on the situation, I have no objection."

¶ 29    Then, Bailiff Hudson testified that she advised the jurors to stop deliberating "the minute that [Juror 54] left the room." According to Hudson, the remaining jurors indicated that they understood the instruction. Hudson stated that Juror 54 was "shaking, she's clammy, she's not able to continue." The court asked whether counsel had any questions of the bailiff. Defendant's attorney stated "No."

¶ 30    The judge then noted that the second alternate juror was five minutes from the courthouse. "The question becomes," the judge said, "whether we call her *** back tonight or whether I instruct everybody to come tomorrow?" The State deferred to defense counsel. Defense counsel noted that deliberations would "start over again." Defense counsel stated: "Given the hour, by the time [the second alternate juror] gets here and they can begin deliberations, I *** wonder how much would really get accomplished before the Court [sends] the jury home for the night anyway." The court asked defense counsel: "So are you asking then to continue the case for deliberations over until tomorrow morning?" Defense counsel replied: "I am." After the bailiff notified the second alternate juror, defense counsel reiterated that she was "keeping my same request, given the hour and given the fact that deliberations would have to begin over again." The court noted that it was 7:46 p.m. and it would grant defendant's request "to begin deliberations tomorrow."

¶ 31    The next morning, the court indicated to counsel that the 11 remaining jurors were in the jury room and the second alternate juror was sequestered elsewhere. The court stated that it intended to instruct the "full" jury that it must begin its "deliberations anew." The court stated that it would also instruct the jury that it "must not simply begin where you left off last night and bring the new juror up to speed on your deliberations from yesterday. You must begin your deliberations

anew." The judge asked for input from the attorneys. The State answered, "That's fine, Judge." Defense counsel responded, "I agree."

¶ 32    Then Hudson testified that the jury foreperson informed her that two of the verdict forms had been signed and were left face down on the table in the jury room. Hudson collected those papers, but she did not look at them. She testified that they were locked in the judge's chambers. The judge gave the attorneys the opportunity to question the bailiff. Neither the State nor defense counsel had any questions.

¶ 33    Next, the judge indicated that he would seal the verdicts that had been signed but "not accept them or take them." Defense counsel stated: "[T]hat's exactly what I was thinking. *** I would not ask the Court to accept [*sic*] those two verdict forms." The State then agreed that the new jury should be given new verdict forms. Defense counsel stated that her second chair was getting them.

¶ 34    The second alternate juror, Juror 126, confirmed that she had not discussed the case with anyone, had not received any information about the case from outside sources, and had not formed any opinions about the case. None of the attorneys had any questions for the juror.

¶ 35    Then the court questioned the jury foreperson, Juror 136. Juror 136 stated that the jury discontinued deliberations when Juror 54 was removed and there were no further deliberations after that. None of the attorneys questioned the foreperson when given the opportunity to do so. The court then instructed all 12 jurors that "this is a new jury, which is separate and independent of the one that deliberated yesterday." The court continued: "You must not simply begin where you left off last night and bring the new juror up to speed on your deliberations from yesterday. You must begin your deliberations anew." In addition, the court advised the jury that "the verdict forms that were in the jury room have been removed and you will now get a clean set, because this

is a separate and independent jury." Hudson was sworn and took charge of the jury. The time was not recorded.

¶ 36    The report of proceedings next indicated that the jury reached a verdict, although the time was not noted in the record.  The jury found defendant guilty of two counts of home invasion and two counts of attempted first-degree murder. The defense polled the jury, which reaffirmed its verdict.

¶ 37    After the court denied defendant's posttrial motions, it sentenced him to 16 years' imprisonment for the attempted murder of Hernandez, six years' imprisonment for the attempted murder of Coquillard, and six years' imprisonment for home invasion,[2] to be served consecutively. Defendant filed an unsuccessful motion to reconsider sentence and then filed a timely appeal.

¶ 38                              II. ANALYSIS

¶ 39    Defendant first contends that the State failed to prove that he possessed the specific intent to kill both Coquillard and Hernandez. When presented with a challenge to the sufficiency of the evidence, this court does not retry the defendant. *People v. Price*, 2011 IL App (4th) 100311, ¶ 16. Rather, we consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Price*, 2011 IL App (4th) 100311, ¶ 16.

¶ 40    To support a conviction of attempted first-degree murder, the State must prove beyond a reasonable doubt that (1) the defendant performed an act constituting a substantial step toward the commission of murder (720 ILCS 5/8-4(a) (West 2012)) and (2) the defendant possessed the

---

[2] The guilty verdicts on the two counts of home invasion merged.

specific intent to kill the victim (720 ILCS 5/9-1(a)(1) (West 2012)). *People v. Peters*, 2018 IL App (2d) 150650, ¶ 19. The intent to kill may be, and usually is, inferred from the surrounding circumstances such as (1) the nature of the attack, (2) the use of a deadly weapon, and (3) whether the defendant voluntarily and willingly committed an act, the natural tendency of which is to take another's life. *Peters*, 2018 IL App (2d) 150650, ¶ 19.

¶ 41    Defendant was prosecuted on the basis that he was accountable for Rosales' conduct. A person is legally accountable for another's conduct if, either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he or she "solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2012); *People v. Flynn*, 2012 IL App (1st) 103687, ¶ 23. Proof that the defendant was present during the offense, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are factors that the jury can consider in determining whether the defendant was accountable. *Flynn*, 2012 IL App (1st) 103687, ¶ 23. The defendant's flight from the scene can also be considered in determining accountability. *Flynn*, 2012 IL App (1st) 103687, ¶ 23.

¶ 42    Defendant asserts that there was no direct evidence of his state of mind. However, in an attempted murder prosecution where the State alleges the defendant's guilt by accountability, the State does not have to prove the defendant's concurrent specific intent to aid or abet in the attempted murder of his victims; the State has to prove only that the defendant aided the codefendant in the contemporaneous commission of the offenses. *People v. Deason*, 223 Ill. App. 3d 320, 328 (1991). The State can prove that a defendant possessed the requisite intent to promote or facilitate a crime by presenting evidence that either (1) he or she shared the criminal intent of the principal, or (2) there was a common criminal design. *People v. Garcia*, 2019 IL App (2d)

161112, ¶ 26. If two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement, and all are equally responsible for the consequences of the further acts. *Garcia*, 2019 IL App (2d) 161112, ¶ 27.

¶ 43    Here, the evidence demonstrated a common criminal design to break into Coquillard's home and attack Hernandez. After drinking at two bars, defendant drove Rosales to Coquillard's residence at 3 a.m., not an hour for a social call. Coquillard was awakened by the sound of breaking glass, and she saw defendant and Rosales kicking their way into the apartment. Both defendant and Rosales immediately pushed past Coquillard and began punching Hernandez. Then defendant punched Hernandez in the face to get him to release Rosales from a headlock. After Hernandez went down, defendant continued to hit him. Defendant did not remove Rosales from the scene until after Rosales had beaten the victims, nor did defendant report the crime. Defendant then drove Rosales home and fled from the police.

¶ 44    Defendant argues that neither he nor Rosales used an "inherently" dangerous weapon, and neither of them articulated an intent to kill prior to or during the beating. Defendant acknowledges, however, that intent can rarely be proved by direct evidence and that it can be shown by surrounding circumstances, including the character of the attack as well as the nature and seriousness of the injury. *People v. Coolidge*, 26 Ill. 2d 533, 536 (1963).

¶ 45    Defendant relies on *People v. Garrett*, 216 Ill. App. 3d 348 (1991), *People v. Jones*, 184 Ill. App. 3d 412 (1989), and *People v. Thomas*, 127 Ill. App. 2d 444 (1970). Those cases are distinguishable. In all three, the defendants had a "clear opportunity" to kill the victims, yet they chose not to do so. *Peters*, 2018 IL App (2d) 150650, ¶ 21. Here, Rosales used household items found at the scene as deadly weapons. Rosales clobbered Hernandez and Coquillard with an iron,

a computer monitor, a printer, and a dining room chair that splintered from the force of the blows. Rosales threatened to kill the victims. We do not attach any significance to whether the threat to kill was made during the attack or immediately after Rosales stopped raining down the blows. The threat was contemporaneous enough with the attack to evince Rosales' present state of mind. Accordingly, looking at the evidence in the light most favorable to the prosecution, we determine that any rational juror could have found beyond a reasonable doubt that Rosales had the specific intent to kill both Coquillard and Hernandez.

¶ 46    Next, defendant argues that the court abused its discretion in replacing Juror 54 instead of *sua sponte* declaring a mistrial. Defendant maintains that the doctrine of plain error (see *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007) (plain-error doctrine bypasses normal forfeiture principles)) requires a new trial, as defendant did not object to the procedure of substituting the second alternate juror. Matters relating to jury selection and management are generally within the discretion of the trial court. *People v. Roberts*, 214 Ill. 2d 106, 121 (2005).

¶ 47    Section 115-4(g) of the Code of Criminal Procedure (Code) (725 ILCS 5/115-4(g) (West 2018)) provides for the replacement of a discharged juror "before the final submission of a cause" to the jury. Illinois Supreme Court Rule 434(e) (eff. Feb. 6, 2013) likewise provides for the replacement of a discharged juror "before the final submission of a cause" to the jury. However, in *Roberts*, our supreme court held that replacement of a discharged juror after a case has been submitted to the jury for deliberations is permissible where there is no prejudice to the defendant. *Roberts*, 214 Ill. 2d at 124. In determining prejudice, courts consider the "totality of the circumstances," including (1) whether the alternate juror and the remaining original jurors were exposed to outside prejudicial influences about the case, (2) whether the original jurors had formed opinions about the case in the absence of the alternate juror, (3) whether the reconstituted jury was

instructed to begin deliberations anew, (4) whether there is any indication that the jury failed to follow the court's instructions, and (5) the length of deliberations both before and after the substitution. *Roberts*, 214 Ill. 2d at 124.

¶ 48    Defendant argues that the replacement of Juror 54 was an abuse of discretion because the original jury had reached a verdict on two counts. The plain-error doctrine permits the appellate court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) a clear or obvious error occurred that is so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565. The first step in a plain-error analysis is to determine whether error occurred. *Piatkowski*, 225 Ill. 2d at 565.

¶ 49    We perceive no error. The two verdict forms that the jury signed were not actual verdicts. The jury's finding does not become a verdict until it has been received, accepted by the court, and entered of record. *People v. Almo*, 108 Ill. 2d 54, 63 (1985). The trial judge is responsible for the conduct of the trial through all its stages, and it is the judge's duty to preserve the integrity of the trial. *Almo*, 108 Ill. 2d at 63. The record shows that the trial judge did this.

¶ 50    The jury ceased deliberating as soon as Juror 54 was removed from the room. The court admonished the reconstituted jury that it was to begin its deliberations "anew." In this regard, the court emphasized that the 11 original jurors were not to take up where they left off and just bring the new juror "up to speed." The court also told the jury that it would be furnished new verdict forms, thus reinforcing that prior deliberations were for naught. There is no suggestion in the record that the reconstituted jury did not follow the court's instructions. The present case is unlike

*Roberts*, where the jury voted twice but the entire jury was also tainted by outside influence. *Roberts*, 214 Ill. 2d at 124-25.

¶ 51    Even if it were error to replace Juror 54, defendant acknowledges that defense counsel acquiesced in the procedure. The State urges that any error was invited by defense counsel's conduct. Even plain-error review is forfeited where a defendant invites the error. *People v. Coan*, 2016 IL App (2d) 151036, ¶ 23. Under the doctrine of invited error, a defendant cannot request to proceed in one manner at trial and then later argue on appeal that the course of action requested was error. *Coan*, 2016 IL App (2d) 151036, ¶ 23. However, merely failing to object to a procedure is not invited error. *Coan*, 2016 IL App (2d) 151036, ¶ 24. Our supreme court in *People v. Harvey*, 211 Ill. 2d 368, 385 (2004), noted that invited error consists of "a defendant's active participation in the direction of the proceedings."

¶ 52    Defendant argues that he "had no role" in Juror 54 becoming ill, nor was he "readily aware" that two verdict forms had been signed by the original jury. Those assertions are true but irrelevant. The issue is whether defendant actively participated in the procedure to replace Juror 54. The record shows that he did.

¶ 53    When the court brought Juror 54's inability to continue deliberating to the parties' attention and stated its intention to excuse her, defense counsel had no objection. Then the court advised the parties that the second alternate juror was only five minutes away. Defense counsel raised no objection to seating the second alternate juror. Counsel noted only that the jury had been deliberating for three hours and that it would soon break for the night. The court asked defense counsel: "So are you asking then to continue the case for deliberations over until tomorrow morning?" Defense counsel replied: "I am." After the second alternate juror was notified, defense counsel reiterated her position that deliberations should begin the next morning. The next morning,

the parties learned that the original jury had signed two verdict forms. In response to the court stating its intention to disregard those verdicts, defense counsel stated: "[T]hat's exactly what I was thinking." When the State agreed that the reconstituted jury should be given new verdict forms, defense counsel provided those to the court.

¶ 54    We hold that defendant actively participated in the direction of the proceeding where (1) defense counsel forcefully argued that the deliberations resume the following morning, (2) counsel agreed to seat the second alternate juror after she learned that the original jury had signed two verdict forms, and (3) counsel supplied fresh verdict forms for the use of the reconstituted jury. Thus, we agree with the State that, if error occurred, it was invited.

¶ 55    Lastly, defendant argues that the State's closing arguments deprived him of a fair trial. Defendant cites 10 instances of improper argument, some of which were preserved for review and some were not. As to those that were unpreserved, defendant cursorily (citing only boilerplate) argues for application of the plain-error doctrine, and, thus, forfeits the argument. "[W]hen a defendant fails to present an argument on how either of the two prongs of the plain-error doctrine is satisfied, he forfeits plain-error review." *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010).

¶ 56    As to those prosecutorial comments that were objected to at trial, defendant merely lists the complained-of comment followed by a one or two sentence argument. Defendant makes no cogent argument and cites no authority for reversal other than generic boilerplate applicable to closing arguments in general. Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) requires parties' briefs to include cohesive arguments and citations to relevant authority for each of its claims. As we often remind parties, this court is not a repository into which an appellant may dump the burden of argument and research, nor is it the obligation of this court to act as an advocate or seek error in the record. *CE Design, Ltd. v. Speedway Crane, LLC*, 2015 IL App (1st) 132572, ¶

18. The failure to provide an argument with authority results in forfeiture of the issue. *CE Design*, 2015 IL App (1st) 132572, ¶ 18. Accordingly, we deem these arguments forfeited.

¶ 57                                      III. CONCLUSION

¶ 58     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 59     Affirmed.