2021 IL App (1st) 190253-U

SIXTH DIVISION
April 16, 2021

No. 1-19-0253

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 17 CR 14919 |
| | ) | |
| ANGELO GRAHAM, | ) | Honorable Dennis J. Porter, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Justices Harris and Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The State proved defendant guilty of aggravated kidnapping and armed habitual criminal beyond a reasonable doubt; defendant received a fair trial; affirmed.

¶ 2    Defendant, Angelo Graham, was convicted by a jury of aggravated kidnapping and of being an armed habitual criminal. The trial court sentenced defendant to 21 years in prison on the aggravated kidnapping conviction, and a concurrent sentence of 6 years in prison for the armed habitual criminal conviction. On appeal, defendant contends that: (1) the State failed to prove

him guilty of aggravated kidnapping and armed habitual criminal beyond a reasonable doubt, and (2) he was denied a fair trial. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged by indictment with two counts of aggravated kidnapping, one count of being an armed habitual criminal, one count of attempted aggravated vehicular hijacking, one count of unlawful use or possession of a weapon by a felon, two counts of aggravated unlawful use of a weapon, and one count of aggravated unlawful restraint. The State proceeded on the aggravated kidnapping, armed habitual criminal, and aggravated unlawful restraint charges.

¶ 5                                    A. Jury Selection

¶ 6     During jury selection, the trial court named 28 individuals as prospective jurors. The trial court asked the jury pool if anything about the nature of the charges would prevent them from giving both sides a fair and impartial trial, and if so, to raise his or her hand. Diana Flores, prospective juror 31, raised her hand.

¶ 7     In response to questioning by the trial court, Maria Flores, prospective juror number 26, answered that neither she nor any member of her family had been the victim of a crime. She stated that she could be fair to both sides.

¶ 8     Defense counsel did not move to strike either Maria Flores or Diana Flores. The trial court announced the jury selections and sent them back to the jury room.

¶ 9     The trial court then began questioning prospective alternate jurors, including prospective juror 31, Diana Flores. Diana informed the court that she had been in a courtroom before for a divorce and her father's murder trial. She stated that she had been the victim of theft. The trial court asked Diana if she could be fair to both sides and she answered, "yes."

2

¶ 10     According to the record, "Maria" Flores was questioned as to why she stated the nature of the charges bothered her. The person in the record identified as Maria stated that her father was kidnapped and murdered and that it still bothered her. The trial court asked whether she could put that aside and decide this case based on the evidence heard in the courtroom. She responded, "I don't know."

¶ 11     The trial court selected "Maria" Flores to be the first alternate. When another juror was excused, "Maria" Flores served on the jury.

¶ 12                                    B. Trial

¶ 13     At trial, the victim, James Babcock, testified that he was dispatched to answer a tow truck call for a customer near highway I-57 in Monee, Illinois during the early morning hours of August 9, 2017. When he arrived, defendant, who the victim identified in open court, was sitting in a vehicle behind another vehicle. The victim requested defendant's identification to obtain authorization from the owner of the vehicle, which defendant provided. The victim wrote down defendant's address and identification number on a receipt that he stored in a receipt book. The victim provided defendant a tow estimate but told him he could not provide a definitive cost unless defendant provided a specific address as to where to take the vehicle. Defendant signed the receipt as proof that he did not have a problem with the estimate, and to show authorization.

¶ 14     The victim then loaded defendant's car onto the back of the tow truck and requested a general idea of where to take the car. Defendant only said to follow him, and to head back to the city. Defendant got into the other car that had been there, and the victim followed that car towards the city. The car and the tow truck exited off the highway at State and West 87th Street near a Jewel-Osco grocery store and pulled over.

3

¶ 15    Defendant approached the tow truck and asked for a price for the tow. The victim calculated the mileage cost and told defendant the price. Defendant went back to the vehicle and brought back a credit card. The victim took the credit card and began imprinting it on a carbon copy receipt pursuant to company policy. He then noticed that the credit card did not list defendant's name. The victim told defendant that he could not accept the credit card because he did not have authorization to use it. The victim testified that defendant was upset by this.

¶ 16    Defendant took back the credit card and returned to the vehicle. Defendant spoke with the woman in that car and then opened the trunk. He looked through a duffle bag and then approached the victim. He asked if the victim could adjust the price of the tow. The victim told defendant he could not do that because of the time of night of the tow. Defendant went back to the other car and looked through the duffle bag again. The woman in the other car then left.

¶ 17    Defendant returned to the tow truck and knocked on the window. He asked the victim if he could tow the car to another location and the victim responded that he could depending on the location. Defendant requested to be towed to the Jewel-Osco parking lot. The victim agreed and unlocked the tow truck so defendant could get inside.

¶ 18    The victim then drove the tow truck to Jewel-Osco, on the other side of the highway. He informed defendant that he could not drop the car until he was paid, at which point defendant responded, "man, I don't want to have to do this." Defendant grabbed the victim's right shirt sleeve and pulled a gun from his waistband. He pointed the gun directly towards the victim with his right hand.

¶ 19    The victim testified that he had handled and shot a gun before. He described defendant's gun as a black, standard handgun. The gun did not have an orange tip, and the victim could tell it

was not a revolver. The victim believed the gun was close to a Glock 9. He had handled guns like the one in defendant's hand in the past.

¶ 20    While defendant was pointing the gun at the victim, he stated that he did not want to hurt him and did not want to have to kill him. The victim saw a police officer drive by the front side of the building on the further west side of the parking lot. He also saw a customer park his car and walk into the grocery store. The victim testified that he did not have a way to get anyone's attention without screaming or yelling and he was afraid he would be shot if he did so. His cell phone was on the dashboard, out of reach.

¶ 21    Defendant then instructed the victim to get back onto the highway and follow his directions because they were taking the vehicle to another location. The tow truck had a GPS dash camera on the windshield that recorded the outside of the truck but did not save footage unless a button was pushed, or if the camera detected abnormal driving. While the victim was driving, defendant pulled the camera off the windshield. The camera fell onto the seat between defendant and the victim.

¶ 22    While the victim was driving, defendant said he did not want to kill the victim tonight, but "if I have to, I have to." Defendant made two or three phone calls with the gun still pointed towards the victim. He stated on the phone that he needed someone to help him handle the tow truck operator and to get rid of the tow truck.

¶ 23    The victim testified that he started to realize that he may not be going home that night because based on defendant's phone conversations, he was under the impression he was going to be killed. Defendant directed the victim to exit the highway, and the victim did not see any businesses in the area. The victim asked defendant where they were going, to which defendant responded, "shut up." The victim then tried to come up with a plan to get out of the situation. He

5

saw an empty BP gas station and took a hard, immediate right-hand turn into a cement block at the end of the pump. The victim exited the tow truck and ran to the inside of the gas station for help.

¶ 24    The victim testified that he started yelling at the gas station attendant to lock the door because there was a man with a gun inside the tow truck that was trying to kill him. The victim called 911 from the attendant's phone. While inside the gas station, the victim saw the tow truck shaking, and knew defendant was trying to drive away. Defendant was unsuccessful and fled the scene on foot.

¶ 25    The victim later returned to his tow truck and located defendant's work order for the tow, which was admitted into evidence. The work order contained defendant's identification information, signature, and description of his location. The work order also showed the credit card defendant attempted to use had the name "Gerry N. Watson" on it.

¶ 26    The State played surveillance videos from the BP gas station and the Jewel-Osco parking lot for the jury. The State also played footage from the dash camera. In the BP gas station footage, the tow truck is seen crashing into the gas station, and the victim identified himself running across the lot. In the Jewel-Osco footage, the victim identified his tow truck and the other car that was in the parking lot at the same time.

¶ 27    On cross-examination, the victim testified that the cabin light was not on when defendant pulled the gun on him, that he did not touch the gun, and did not hear the gun strike any other objects.

¶ 28    Chicago Police Detective Jerry Ivory testified that he responded to a vehicle hijacking at 1001 South First Avenue in Maywood, Illinois, at a BP gas station, on August 9, 2017. Detective Ivory spoke to the victim at the scene, and the victim was visibly upset. Detective Ivory used the

information from the work order that the victim provided him to match records in the Chicago Police database. He obtained a photograph of defendant.

¶ 29    After speaking with the victim, Detective Ivory learned of the camera in the tow truck. He obtained footage from the Jewel-Osco, as well as from the BP gas station. A recording was shown of the Go Lo gas station, across the street, which showed the tow truck colliding with the BP gas station, and "another subject" running from the tow truck into the Go Lo gas station. Detective Ivory observed that "he [was] holding his right pocket, pants."

¶ 30    On cross-examination, Detective Ivory testified that he did not obtain footage from the dash camera because he did not know how to retrieve that information. The victim indicated that he could do it, so arrangements were made to meet later. Detective Ivory then spoke to the victim later and he said he was unable to have it done. They then went to the Chicago Police tech lab at which time the information was retrieved from the camera.

¶ 31    The parties stipulated that defendant had been convicted of two qualifying felony offenses for purposes of the armed habitual criminal statute. The State then rested.

¶ 32    Defense counsel called Latonya Richardson to testify. Richardson testified that she had been friends with defendant for 12 years, and she received a call from him on August 9, 2017, saying that his car had stopped. Richardson woke her 12-year-old daughter and went to defendant's location. She attempted to jump his car, but it would not start, so defendant called a tow company from his phone. Defendant then put the items from the trunk of his car into the trunk of Richardson's care because he was going to try to leave his car overnight with a mechanic on 87th Street.

¶ 33    When the tow truck arrived, defendant got in Richardson's car and they led the way to 87th and State, with the tow truck following them. Once there, the tow truck driver handed

defendant a piece of paper with the amount of money owed on it, and defendant told Richardson to open the trunk. In the trunk there was a bucket with defendant's cash in it. He told her to go home because the tow truck driver was going to take him to Maywood. She then left.

¶ 34    During closing argument, defense counsel argued that what happened between the parties was not a crime but merely a towing dispute. In rebuttal, the State argued that defendant thought he was going to get away with using another person's credit card to pay for the tow, but his plan did not work.

¶ 35    The jury then deliberated and reached a verdict. The jury completed three signed verdict forms for: armed habitual criminal, aggravated unlawful restraint, and aggravated kidnapping. The trial court reviewed the verdict forms and found that two were not completed correctly. The verdict form for armed habitual criminal was completed correctly, however, the forms for unlawful restraint and kidnapping only had the foreperson's signature. The State printed new verdict forms for the jury to complete.

¶ 36    Defense counsel moved for a mistrial based on the incorrect verdict forms, but the trial court did not declare a mistrial. The jury was provided the correct verdict forms and instructions on how to complete them. After reconvening, the jury returned a verdict finding defendant guilty of the offenses of aggravated kidnapping and armed habitual criminal.

¶ 37    Defendant filed an amended motion for a new trial arguing that the confinement of the victim was incidental to the separate offense of theft of labor or services. In the motion, defendant made no mention of Maria Flores serving on the jury, or that inadmissible evidence was presented at trial.

¶ 38    The trial court denied defendant's amended motion for a new trial. The trial court noted that the situation would have been theft of services if, in the Jewel-Osco parking lot, defendant

8

had demanded his car be let down and then driven off. The trial court found that the duration and intention was significant, and that the detention was not inherent of the offense of theft of services and did not occur during the commission of a separate offense.

¶ 39    Defendant was sentenced to 21 years in prison for the aggravated kidnapping conviction and a concurrent 6 years in prison for armed habitual criminal conviction. Defendant now appeals.

¶ 40                                II. ARGUMENT

¶ 41    On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt of the convictions of aggravated kidnapping and armed habitual criminal. Alternatively, defendant contends that the confinement was merely incidental to the offense of theft of labor services. The State responds that the totality of the evidence, when viewed in a light most favorable to the prosecution, proved defendant guilty of aggravated kidnapping beyond a reasonable doubt.

¶ 42                         A. Sufficiency of the Evidence

¶ 43    Reviewing courts resolve a sufficiency of the evidence challenge by determining whether, after considering the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005) (citing *People v. Cox*, 195 Ill. 2d 378, 387 (2001)). It is the responsibility of the fact finder, not the reviewing court, to determine the credibility of the witnesses, resolve any conflicts presented by the evidence, and draw reasonable inferences from the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). A trial court's judgment can only be set aside when the proof is so unsatisfactory, improbable, or implausible that it justifies a reasonable doubt as to defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 44                                     i. Confinement

¶ 45     To sustain a conviction for aggravated kidnapping, the State was required to prove that defendant knowingly and secretly confined the victim against his will while armed with a firearm. 720 ILCS 5/10-1(a)(1) (West 2016); 720 ILCS 5/10-2(a)(6) (West 2016). This court defines "secret confinement" as "imprisoning or restraining someone" or "enclosure within something, most commonly a structure or an automobile" in such a manner that the subject or the place is "concealed, hidden, or not made public." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 227 (2009). "The secret confinement element may be shown by proof of the secrecy of the confinement or the secrecy of the place of confinement." *Siguenza-Brito*, 235 Ill. 2d at 227. Confinement is secret where it " 'serves to isolate or insulate the victim from meaningful contact or communication with the public, that is, when the confinement is in a place or in a manner which makes it unlikely that members of the public will know or learn of the victim's unwilling confinement within a reasonable period of time.' " *People v. Gonzalez*, 239 Ill. 2d 471, 480 (2011) (quoting 3 Wayne R. LaFave, Substantive Criminal Law § 18.1(c), at 17 (2d ed. 2003)). "This court has long ago rejected any *per se* rule that a victim visible in a public place precludes a finding of secret confinement." *Gonzalez*, 239 Ill. 2d at 481-82.

¶ 46     Here, the State proved beyond a reasonable doubt that defendant confined the victim inside the tow truck at Jewel-Osco and while driving down the highway. While sitting in the tow truck, defendant pulled a gun from his waistband and pointed it directly at the victim. The victim testified that he was afraid for his life, and that he was afraid of being shot. Pointing a gun at the victim while inside a vehicle made it unlikely that members of the public would know of the unwilling confinement. The fact that he was in a parking lot and could see other people in the

parking lot did not make the confinement public. *Id*. (this court has rejected any *per se* rule that a victim visible in a public place precludes a finding of secret confinement.)

¶ 47    Defendant, while continuing to point the gun at the victim, then forced the victim to drive out of the parking lot and start heading towards an undisclosed location. During the drive, defendant knocked down the dash camera and made threats that he would kill the victim if he had to. Defendant also made a phone call in which he indicated he needed help handling a tow truck driver and disposing of a tow truck. The evidence, when looking at it in a light most favorable to the prosecution, shows that defendant prevented the victim from leaving the tow truck and from contacting other people by pointing a gun at him and directing him to drive to an undisclosed location. We find that a reasonable trier of fact could find the element of secret confinement beyond a reasonable doubt.

¶ 48    We find this case comparable to *People v. Bishop*, 1 Ill. 2d 60 (1953). In *Bishop*, the defendant contacted an automobile salesman to take a vehicle for a test drive. *Id*. at 62. After driving for three miles, the defendant produced a gun, pointed it at the victim, took his money, and forced him to drive to another town. *Id*. Our supreme court found that a person who is forcibly confined in an "automobile constantly moving from place to place may be more secretly confined and effectively confined from the kidnapper's standpoint than one kept in a building or other place of incarceration." *Id*. at 64. The court held that the confinement was secret in that "[c]ommon experience has shown that a victim and his kidnapper so situated can be most difficult to locate." *Id*. "In relevant part, this court rejected the defendant's assumption that there could be no secret confinement in a vehicle on a public roadway." *Gonzalez*, 239 Ill. 2d at 482 (citing *Bishop*, 1 Ill. 2d at 64).

11

¶ 49    Similarly here, defendant entered the victim's tow truck, pointed a gun at him, and forced him to drive to an undisclosed location over the course of 30 minutes.

¶ 50    We find defendant's reliance on *People v. Sykes*, 161 Ill. App. 3d 623 (1987) and *People v. Lamkey*, 240 Ill. App. 3d 435 (1992), for the proposition that the State failed to prove him guilty of secretly confining the victim, unpersuasive.

¶ 51    In *Sykes*, the defendant approached the ten-year-old victim as she walked to school, grabbed her by the arm, and dragged her into an alley. *Sykes*, 161 Ill. App. 3d at 625. The defendant threatened to kill the victim if she screamed and placed a gun to her head. The defendant attempted to gain entry to an apartment building, which the manager of the building denied. *Id.* The defendant then pulled the victim down the street and the manager followed. *Id.* at 626. When the victim saw another man across the street, she yelled for help. *Id.* The defendant then ran away. *Id.* On appeal from his conviction for aggravated kidnapping, the defendant argued that the state failed to prove the secret confinement element beyond a reasonable doubt. *Id.* at 628. The *Sykes* court noted that "the victim simply was not confined or enclosed within any place or any thing." *Id.* The court held that the State had failed to prove the victim was "secretly confined" and reversed the defendant's conviction. *Id.* at 629.

¶ 52    In *Lamkey*, the defendant jumped from the doorway of a building, grabbed a ten-year-old girl as she walked down a busy Chicago street, and pulled her in the hallway of a building where he sexually assaulted her. 240 Ill. App. 3d at 436. The hallway was between the door to the street where the victim had been walking and an interior door that led upstairs and was open during the attack. *Id.* The victim testified that she could see cars and pedestrians passing by during the attack in the small hallway. *Id.* at 437. One such driver saw the defendant pull the victim into the door. *Id.* The driver stopped his car in front of the door, sounded his car horn, and the defendant

fled up the stairs at the back of the hallway. *Id*. The driver testified that the attack "occurred in an area clearly visible to anyone walking or driving down the street." *Id*.

¶ 53    On appeal, the defendant argued that the State failed to prove that a secret confinement occurred. *Id*. at 438. The *Lamkey* court, relying on *Sykes*, held that the State failed to prove the element of secret confinement. *Id*. at 439. The court noted that the defendant remained within public view in the vestibule in an area clearly visible to anyone walking or driving down the street. *Id*. The court also held that the detention was merely incidental to the separate offense of aggravated criminal sexual assault. *Id*.

¶ 54    In *Lamkey*, the court relied on the fact that defendant and the victim at all times "remained within public view." *Id*. at 439. The driver who honked his horn saw the assault take place after stopping his car. *Id*. In *Sykes*, the court relied solely on the fact that the alleged confinement did not take the form of enclosure within a place or a thing. *Sykes*, 161 Ill. App. 3d at 628. Moreover, the *Sykes* court did not discuss or apply Illinois law rejecting "any *per se* rule that a victim visible in a public place precludes a finding of secret confinement." *Gonzalez*, 239 Ill. 2d at 481-82. Accordingly, when looking at the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that defendant confined the victim beyond a reasonable doubt.

¶ 55                          ii. Confinement Incidental to Another Offense

¶ 56    Defendant alternatively argues that under the *Levy-Lombardi* doctrine, if there was confinement, it was "merely incidental" to the lesser included offense of theft of services. *People v. Levy*, 15 N.Y. 2d 159 (1965); *People v. Lombardi*, 20 N.Y. 2d 266 (1967); *People v. Eyler*, 133 Ill. 2d 173, 199) ("Generally speaking, the *Levy-Lombardi* doctrine states that a defendant cannot be convicted of kidnapping where the asportation or confinement of the victim was

13

merely incidental to another crime ***.") Significantly, we note that in all the cases defendant cites to for this proposition the defendant was charged with the lesser-included or separate offense. See *People v. Smith*, 91 Ill. App. 3d 523, 529 (1980) (defendant charged with robbery and aggravated kidnapping); *People v. West*, 2019 IL App (1st) 162400, ¶ 14 (defendant charged with armed robbery and aggravated kidnapping); *People v. Young*, 115 Ill. App. 3d 455, 470 (1983) (defendant charged with rape and aggravated kidnapping). Here, defendant was not charged with theft of services. Nevertheless, we find that even if he had been, the confinement in this case was not merely incidental to theft of services.

¶ 57     In *Eyler*, our supreme court held that a defendant "cannot be convicted of kidnaping where the asportation or confinement of the victim was merely incidental to another crime, such as robbery, rape, or murder." 133 Ill. 2d at 199. A court must consider the following factors to determine whether the confinement amounts to the independent crime of kidnapping: "(1) the duration of the asportation or detention; (2) whether the asportation or detention occurred during the commission of a separate offense; (3) whether the asportation or detention is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense" *Siguenza-Brito*, 235 Ill. 2d at 225-26.

¶ 58     As to the first element, the duration of the detention was approximately 30 minutes. Defendant pointed a gun at the victim in a Jewel-Osco parking lot in Chicago. They then drove down the highway for a period of time, eventually exiting in Maywood. During arguments on defendant's amended motion for a new trial, defense counsel stated that the duration was 30 minutes. Illinois courts have found this element to be met when the detention or asportation was significantly less than 30 minutes. See *Siguezna-Brito*, 235 Ill. 2d at 225-26 (an asportation of four to five minutes was found to satisfy this element); *People v. Casiano*, 212 Ill. App. 3d 680,

687 (1991) (an asportation of one and half blocks sufficient to satisfy this element). Accordingly, this element has been met where the victim was confined for several miles and approximately 30 minutes.

¶ 59    The next element to consider in determining whether an asportation or detention rises to the level of kidnapping is whether it occurred during the commission of a separate offense. Here, defendant contends that the separate offense was theft of services. Theft of services occurs when a person "knowingly obtains the temporary use of *** services of another which are available only for hire, by means of threat or deception or knowing that such use is without the consent of the person providing the *** services." 720 ILCS 5/16-3(a) (West 2016). Defendant contends that detaining the victim in the tow truck was necessary for him to complete the offense of theft of services because he could not drive the tow truck or unload his vehicle himself and therefore needed the victim to perform those services.

¶ 60    However, defendant asked the victim to drive him to a Jewel-Osco parking lot, at which point the tow was complete. All that was left was for the victim to unload defendant's car after payment. When defendant's payment attempt failed, he then got into the tow truck and threatened the victim, forcing him to drive to an undisclosed location. There was no discussion of where they were going, and in fact, defendant made calls in which he indicated that he needed help disposing of a tow truck and handling a tow truck driver. This was a separate offense than theft of services.

¶ 61    The next factor is whether the asportation or detention was inherent in a separate offense. *Siguenza-Brito*, 235 Ill. 2d at 225-26. In order for an asportation or detention to be inherent in a separate offense, it must constitute an element of that offense. *People v. Quintana*, 332 Ill. App. 3d 96, 108 (2002). As mentioned above, theft of services occurs when a person "knowingly

15

obtains the temporary use of *** services of another which are available only for hire, by means of threat or deception or knowing that such use is without the consent of the person providing the *** services." 720 ILCS 5/16-3(a) (West 2016). Detention or asportation is not, as defendant concedes, an element of theft of services. Defendant could have used force or threat of force to make the victim unload his car in the Jewel-Osco parking lot and allowed the victim to drive away. Or he could have forced the victim out of the tow truck and driven away with the tow truck, leaving the victim at Jewel-Osco. Instead, defendant forced the victim to drive away at gunpoint, to an undisclosed location.

¶ 62    The final factor to consider is whether the detention or asportation created a significant danger to the victim independent of those created by theft of services. This court has held that "once the victim is confined within a moving vehicle, the possibility that an accident might occur or the victim might injure [himself] attempting to escape from a moving vehicle increases the risk of harm resulting from asportation." *People v. Thomas*, 163 Ill. App. 3d 670, 679 (1987). Here, forcing the victim to drive down the highway to an undisclosed location at gunpoint triggered a potential risk of harm to the victim which was substantially increased above that necessarily present in the crime of theft of services.

¶ 63    Defendant's reliance on *People v. Young*, 115 Ill. App. 3d 455, 469 (1983), does not persuade us otherwise. In *Young*, the victim met defendant and was conversing with him when he suddenly grabbed her, threw her against the wall of a shed, pushed her to the ground, and sexually assaulted her. *Id*. at 458. On appeal, the defendant argued that his conviction for unlawful restraint violated the one-act, one-crime principle because it arose from the same physical act as his sexual assault conviction. *Id*. at 468. The court on review found that the act of

restraining the victim during the sexual assault was only necessary to complete the assault, and the restraint did not create a significant danger independent of the assault. *Id.* at 470.

¶ 64    As discussed above, defendant did not have to detain the victim to commit theft of services. He could have forced the victim to unload his car in the Jewel-Osco parking lot, or he could have stolen the tow vehicle itself and driven it to his final destination. Accordingly, looking at the facts of this case under the four-part test, we find that aggravated kidnapping was not merely incidental to the offense of theft of services.

¶ 65                                iii. Firearm Testimony

¶ 66    Defendant's next contention is that the State failed to prove beyond a reasonable doubt that the act was done using a firearm. In support of this contention, defendant notes that the State never recovered a gun, it never found a gun in the tow truck, and it never found a gun when defendant was arrested. The State's only evidence of the existence of a firearm during the alleged crime was the victim's testimony. Defendant contends that the victim was "not trained to identify firearms" and that it was dark outside when "he saw what he thought was a gun." Defendant also relies on the fact that the victim was looking out the windshield most of the time, and not at the gun, and that he did not touch the gun or hear it strike anything during the incident. Defendant also stated none of the video footage played during trial showed defendant with a firearm, and Richardson testified that she did not see defendant with a gun that night.

¶ 67    "Both the supreme court and this court have consistently held that eyewitness testimony that the offender was armed with a gun, combined with circumstances under which the witness was able to see the weapon, is sufficient to allow a reasonable inference that the weapon was a real gun." *People v. Davis*, 2015 IL App (1st) 121867, ¶ 12. To find a witness's testimony that a defendant possessed a firearm sufficient, it is not necessary that the witness be familiar with

firearms or have the ability to distinguish among various types of firearms. *People v. Charles*, 2018 IL App (1st) 153625, ¶ 29. "Reviewing courts have upheld trial court determinations that the defendant possessed a firearm even where very little description of the weapon was presented." *People v. Jackson*, 2016 IL App (1st) 141448, ¶ 17.

¶ 68     Here, the victim testified that the gun defendant pointed at him was black and was a standard black handgun. The gun did not have an orange tip. The victim could tell the gun was not a revolver from the barrel and testified that it was a semi-automatic gun or a single-fire gun. The victim believed the gun was a Glock 9 or something close to that. He testified that he had handled guns like the one that was pointed at him in the past. These details were sufficient to prove beyond a reasonable doubt that defendant was armed with a firearm during the commission of the offense. There was no testimony indicating that the victim's view was obstructed. Video footage of defendant running from the tow truck after the victim crashed it shows defendant holding his pocket as he ran. As noted above, it is the responsibility of the fact finder, not the reviewing court, to determine the credibility of the witnesses, resolve any conflicts presented by the evidence, and draw reasonable inferences therefrom. *Jackson*, 232 Ill. 2d at 280-81.

¶ 69     Accordingly, after viewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of aggravated kidnapping and armed habitual criminal beyond a reasonable doubt.

¶ 70                              B. Denial of a Fair Trial

¶ 71     Defendant next argues that he was denied a fair trial for five reasons: (1) the jury was not impartial; (2) inadmissible evidence was introduced; (3) inadmissible witness testimony was presented; (4) irrelevant and prejudicial statements were made during closing arguments; and (5)

the jury failed to comply with the court's instructions. Defendant contends that these errors require reversal and a new trial. The State responds that no errors occurred and, that even if errors did occur, the errors were harmless.

¶ 72                                    i. Impartial Jury

¶ 73    Defendant contends that he was denied the right to a fair and impartial jury when a biased juror was permitted to render a verdict in this case. Specifically, defendant argues that one of the jurors stated that she did not know if she could fairly consider the facts of the case. However, defendant notes in a footnote that there is "possible confusion" regarding whether this testimony was made by Maria Flores or Diana Flores. The State maintains that this argument is without merit as the complained-of juror was not selected to be on the jury.

¶ 74    Two prospective jurors, both with the last name Flores, were questioned by the trial court during *voir dire*. Prospective juror 26 was Maria Flores, who served on the jury. Prospective juror 31 was Diana Flores, who did not serve on the jury. When the trial court asked whether the nature of the charges would prevent anyone from giving both sides a fair and impartial trial, Diana raised her hand. Diana testified that she had been in a courtroom before for both a divorce and her father's murder trial. Maria, on the other hand, testified that neither she nor her family members had ever been the victim of a crime.

¶ 75    Later, a person identified as "Maria Flores" in the record, stated that she had difficulty with the charges because her father was kidnapped and then murdered and that it still bothered her. When asked if she could put that aside and decide the case based on the evidence, she stated, "I don't know." A review of the entire *voir dire* indicates that this testimony was actually Diana Flores's testimony, not Maria Flores's testimony. Diana was not on the jury and did not render a verdict in this case. See *People v. Jimerson*, 166 Ill. 2d 211, 227 (1995) (courts are not required

19

to suspend common sense when evaluating the record). A commonsense review of this testimony lends substantial support to the conclusion that Diana Flores was misidentified as "Maria" Flores by the court reporter when giving her testimony regarding her father's kidnap and murder. Maria Flores, not Diana Flores, served on the jury. Accordingly, defendant was not denied the right to a fair trial.

¶ 76                                 ii. Inadmissible Evidence

¶ 77    Defendant contends the video evidence from the camera mounted on the tow truck's dashboard was inadmissible because it was not properly preserved, and it was incomplete. Defendant concedes that this evidence was not objected to at trial and the issue was not raised in a posttrial motion. Accordingly, he asks us to review this issue pursuant to the plain error doctrine.

¶ 78    Law enforcement's destruction of, or failure to preserve " 'potentially useful evidence' " is not a due process violation where the defendant cannot demonstrate bad faith on the part of law enforcement. *People v. Hobley*, 159 Ill. 2d 272, 307 (1994) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Proper considerations for the trial court when determining whether due process was violated include the degree of bad faith or negligence by the State in destroying or failing to preserve the evidence and the importance of the lost evidence compared to the evidence at trial. *Id.* Bad faith "implies a furtive design, dishonesty, or ill will." *People v. Danielly*, 274 Ill. App. 3d 358, 364 (1995).

¶ 79    Here, defendant cannot show bad faith on the part of law enforcement for failing to preserve evidence that has not been identified. Two videos from the dashboard camera were admitted at trial. The victim testified that the camera faced the outside of the truck and it only saved footage when the button was pressed or when the camera detected abnormal driving. The

20

victim did not press the button, and the victim did not drive abnormally until he crashed into the BP station. The victim testified that after the crash he found the dashboard camera. He was unable to access the camera at home but brought it to Detective Ivory three days later when he met with him.

¶ 80    There is simply nothing in the record to suggest that there was additional dash camera footage that was not obtained by law enforcement. See *People v. Strobel*, 2014 IL App (1st) 130300, ¶ 11 ("There is nothing in this record to support any inference or suggestion that the police of prosecution intentionally or inadvertently destroyed any preexisting discoverable evidence.") A due process violation requires more than speculation of bad faith on the part of the police. *People v. Ward*, 154 Ill. 2d 272, 298 (1992).

¶ 81    Defendant nevertheless contends, relying on *People v. Nunn*, 2014 IL App (3d) 120614, that the detective allowed the victim to take the dash camera home with him from the scene, and while in his possession the victim "could have deleted or altered the footage, either intentionally or inadvertently." In *Nunn*, the defendant was convicted of aggravated battery of a peace officer and resisting arrest following an incident at a convenience store. *Id.* ¶¶ 1, 3. An estimated 100 to 200 people were present for the arrest, and some of them recorded the encounter. *Id.* ¶ 6. Police ordered onlookers not to record the encounter and to destroy videos on their phones. *Id.* ¶ 18. The court found that the officers' actions were in bad faith, and that the most likely reason for the officers to order destruction of the videos was if the videos captured improper conduct. *Id.* ¶ 20.

¶ 82    *Nunn* is inapposite to the case at bar. In that case, there was evidence that video footage existed of the encounter, but that the police officers ordered onlookers to destroy the video footage. Here, as discussed above, there is no indication that any other camera footage exists

21

from the dashboard camera. Accordingly, because we find that no error occurred here, there could be no plain error. *People v. Cosby*, 231 Ill. 2d 262, 273 (2008) ("[a]bsent reversible error, there can be no plain error.")

¶ 83                                    iii. Inadmissible Witness Testimony

¶ 84    Defendant next contends that the trial court abused its discretion when it overruled defense counsel's objections to irrelevant and unduly prejudicial witness testimony. Specifically, defendant argues that the State was permitted, over objection, to ask the victim about the type of gun defendant was carrying on the night in question. Defendant contends that this question called for speculation, making it irrelevant and inadmissible.

¶ 85    We review a court's evidentiary ruling for an abuse of discretion. *People v. Lerma*, 2016 IL 118496, ¶ 23. "An abuse of discretion occurs only where the trial court's decision is 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *Id*. (quoting *People v. Rivera*, 2013 IL 112457, ¶ 37). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). However, relevant evidence is generally inadmissible if the prejudicial effect of admitting that evidence substantially outweighs any probative value. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 86    Here, both the offenses of aggravated kidnapping and armed habitual criminal required the State to prove that defendant was armed with a firearm. The victim's description of the gun was the only evidence presented regarding the firearm, and therefore had a tendency to make the existence of a real gun more probable than it would be without the testimony. While defendant contends that eliciting the type of gun was irrelevant to the charged offenses, he does not cite to

any cases stating that testimony regarding the type of gun was irrelevant where the charged offenses required the State to prove defendant was armed with a firearm.

¶ 87    To the contrary, there are plenty of cases allowing this type of testimony in Illinois. See *People v. Wright*, 2017 IL 119561, ¶¶ 76-77 (testimony that the gun looked like a black, automatic gun, and that the witness believed it to be a 9-millimeter pistol admissible to prove codefendant was armed with a firearm during the robbery); *People v. Clifton*, 2019 IL App (1st) 151967, ¶¶ 38-39 (testimony that the gun was black, a revolver, and either a .32 or .38 caliber was admissible and proper where it had a level of specificity that proved it was an actual firearm). Accordingly, the trial court did not abuse its discretion in overruling defense counsel's objection.

¶ 88    The trial court also did not abuse its discretion when it overruled defense counsel's objection when the State asked the victim the basis for his belief that if he took defendant to the requested location, he would be in danger. Defendant contends that once the victim established that he believed he was in danger, there was no need to elicit further testimony regarding the telephone conversations defendant had in the tow truck. However, those statements were necessary to explain why the victim thought he would be in grave danger if he continued to the destination, and why he felt it was imperative to crash the tow truck before arriving at that location. The victim's testimony was that defendant called another person and told that person that he needed help handing the tow truck driver and getting rid of the tow truck. We find that such testimony was relevant and not prejudicial.

¶ 89    Likewise, we find that the trial court did not abuse its discretion in overruling defense counsel's objection to the State's questioning of Richardson on cross-examination regarding the attempts made by the State's Attorney's Office to reach her. As both parties note, a "refusal to

talk in advance of trial to the other side reasonably could indicate hostility by the witness to the inquiring side, or at least a bias for, or an interest in, a favorable outcome for the side calling him." *People v. Van Zile*, 48 Ill. App. 3d 972, 977 (1977); but see *People v. Brown*, 87 Ill. App. 3d 368, 372 (1980) (eliciting information from a witness that refused to be interviewed prior to trial was not impeachment because "a witness has a right to refuse to submit to such questioning). Here, the trial court did not abuse its discretion in allowing the State to question Richardson as to why she did not respond to attempts by the State to reach her, as Richardson's credibility was at issue.

¶ 90    Moreover, on redirect examination, Richardson was able to explain why she did not respond to the purported voicemails left on her phone – because she did not receive the voicemails, and because she had a new phone – thereby removing any unfavorable inferences or impressions raised on cross-examination. See *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 43 (on redirect examination a witness may be asked questions designed to remove unfavorable inferences or impressions).

¶ 91                                iv. Irrelevant and Prejudicial Statements

¶ 92    Defendant next contends that during closing arguments the State improperly suggested that defendant attempted credit-card fraud in addition to the charged offenses. Specifically, defendant takes issue with the prosecution's suggestion during rebuttal that "[m]aybe defendant thought he was going to get away with using someone else's credit card to pay for the tow, and that was his plan and it didn't work." Defendant claims there was no evidence that defendant did not have permission from the cardholder to use the card he provided to the victim. Defendant contends this statement was only meant to inflame the jury.

¶ 93    "It is well settled that prosecutors are afforded wide latitude in closing argument, and even improper remarks do not merit reversal unless they result in substantial prejudice to the defendant." *People v. Burman*, 2013 IL App (2d) 110807, ¶ 25. "During closing arguments, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel that invite response, and comment on the credibility of the witnesses." *Id.* "In reviewing whether comments made during closing argument are proper, we must review the closing argument in its entirety and view remarks in context." *Id.*

¶ 94    Here, during closing argument, defense counsel stated that defendant had made many mistakes in his life, including on the night of the incident. During rebuttal, the prosecution stated that defendant had made a mistake that night and that maybe he thought he was going to get away with using someone else's credit card to pay for the tow, and that was his plan and it did not work. Defense counsel objected, but the trial court responded, "she may argue."

¶ 95    The prosecution's comments were based on evidence admitted at trial. Defendant did attempt to use a credit card that was not his own credit card. The evidence showed that the credit card did not have defendant's name on it. The evidence showed that soon after the victim rejected the credit card, the night escalated, with defendant telling Richardson to leave, and eventually pulling a gun on the victim inside the tow truck. Keeping in mind that the prosecution has wide latitude during closing arguments, the prosecutor's remark on rebuttal that "maybe" defendant thought he was going to get away with using someone else's credit card was a reasonable inference to have drawn from the evidence, which showed that defendant attempted to use a credit card that did not have his name on it to pay for the tow. Accordingly, we find that

the prosecutor did not make improper comments during closing arguments, and that there was no substantial prejudice to defendant based on the prosecutor's comments.

¶ 96                              v. Jury Failed to Comply with Court Instructions

¶ 97    Defendant's final contention, without citation to authority, is that the trial court abused its discretion when it did not declare a mistrial after the jury returned improperly completed verdict forms. "A mistrial should be granted where an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuation of the proceedings would defeat the ends of justice." *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). The trial court's denial of a mistrial will not be disturbed absent a clear abuse of discretion. *People v. Bishop*, 218 Ill. 2d 232, 251 (2006).

¶ 98    Here, the jury completed three signed verdict forms: one for armed habitual criminal; one for aggravated unlawful restraint, and one for aggravated kidnapping. The verdict form for armed habitual criminal was completed correctly. The unlawful restraint and aggravated kidnapping forms only had the foreperson's signature on them for a guilty verdict. The trial court denied defense counsel's motion for a mistrial and instead provided the jury with new verdict forms and instructed them again. The jury then completed the verdict forms correctly, finding defendant guilty of the offenses of aggravated kidnapping and armed habitual criminal.

¶ 99    We find this case to be akin to *People v. Almo*, 108 Ill. 2d 54 (1985), where the jury completed the verdict forms incorrectly and the defendant moved for a mistrial. *Id.* at 62. After denying the motion, the trial court reinstructed the jury and the jury then completed the verdict forms correctly. *Id*. Our supreme court found that the trial court's handling of the situation was proper, stating, "The obvious way to correct the misapprehension was for the trial judge to do precisely what he did ***. We find the court's actions in this case to be both sensible and

practical and clearly not an error." *Id.* at 64. Likewise, in the case at bar, we find that the trial court's handling of the situation was proper and not an abuse of discretion.

¶ 100                                    III. CONCLUSION

¶ 101   For the foregoing reasons, we find that defendant's convictions for aggravated kidnapping and armed habitual criminal were proven by the State beyond a reasonable doubt, and that defendant was not deprived of a fair trial by any alleged trial errors.

¶ 102   We affirm the judgment of the circuit court of Cook County.

¶ 103   Affirmed.