**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210042-U

Order filed October 26, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-21-0042 Circuit No. 18-CF-356 |
| | ) | |
| STEVEN R. PLYMALE, | ) ) | Honorable Katherine S. Gorman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HAUPTMAN delivered the judgment of the court.
Justices Holdridge and McDade concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  Defendant was not unlawfully subjected to double jeopardy and was not prejudiced by the court's erroneous admission of an out-of-court statement.

¶ 2     Following a jury trial, defendant, Steven R. Plymale, was convicted of aggravated criminal sexual abuse. In this direct appeal, defendant contends the jury's not guilty verdict on count II resulted in an acquittal, such that defendant was unlawfully subjected to double jeopardy when the court sent the jury back to deliberate a second time. Defendant also alleges that the

court erroneously admitted one of the victim's out-of-court statements, resulting in prejudice to defendant. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant by information in May 2018, with one count of predatory criminal sexual assault of a child and two counts of aggravated criminal sexual abuse. All three counts alleged defendant's niece, Z.L., was the victim. Prior to trial, the State filed a motion to admit out-of-court statements made by Z.L. as substantive evidence pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2018). The State advised that it intended to introduce: (1) testimony by Z.L.'s mother, Ligeia, regarding Z.L.'s disclosure on February 25, 2017; (2) testimony by forensic interviewer Larry Milsteadt regarding Z.L.'s statements during interviews at the Children's Advocacy Center (CAC) on March 8, 2017, and June 14, 2017; and (3) video recordings and transcripts from the CAC interviews. The State also filed a motion to admit propensity evidence pursuant to section 115-7.3 of the Code in the form of the testimony of B.L., K.S., and E.H. The court granted the State's motion pursuant to section 115-7.3, finding that the uncharged crimes were similar, close in proximity in time, happened in defendant's home, and that the age range of the victims was similar. The court also granted the State's motion pursuant to section 115-10 over counsel's objection that the statements were cumulative and unreliable.

¶ 5        On July 24, 2019, Z.L. made an additional disclosure at the CAC, prompting the State to charge defendant by superseding indictment with predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)) (count I), and aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)) (counts II and III). Common to all counts was the date range of the alleged offenses, May 25, 2016, through February 25, 2017, and the allegation that defendant was over

2

17 years of age and Z.L. was under 13 years of age at the time of the offenses. Count I alleged that defendant knowingly committed an act of sexual penetration upon Z.L. in that defendant made contact between his mouth and the sex organ of Z.L. Count II alleged that defendant touched Z.L.'s breasts with his hands for the purpose of his sexual gratification. Count III alleged that defendant touched Z.L.'s hips and genital region with his hands for the purpose of his sexual gratification.

¶ 6        Thereafter, the State filed a motion to substantively admit the out-of-court statements given by Z.L. during a CAC interview on July 24, 2019, when Z.L was 14 years of age. The court again granted the State's motion over defendant's argument that the statements were unreliable.

¶ 7        Defendant's jury trial commenced on September 28, 2020. Z.L., who was 16 years old at trial,[1] testified that defendant was her uncle and they had a very close relationship, such that Z.L. considered defendant a father figure. Z.L. and her mother previously lived with defendant, his wife, Racheal, and several cousins at defendant's home in Pekin.

¶ 8        Z.L. testified that defendant first inappropriately touched her after defendant took Z.L. hunting when she was 11 years old. As they were about to leave, Z.L. asked defendant if they could go to McDonald's. Defendant responded that they could if Z.L. exposed her breasts. Z.L. pulled up her shirt, and defendant touched her breasts with his bare hands for approximately one minute. Z.L. testified that defendant touched her breasts on several other occasions but was unable to recall specific facts relating to these occasions. When asked if defendant touched her breasts at the house, Z.L. responded "[n]ot that I can remember. It was usually like stuff outside of the house sometimes."

_____

[1]The parties stipulated that defendant's date of birth was January 29, 1970, and Z.L.'s date of birth was August 10, 2004.

¶ 9 Z.L. further recalled that she was frequently home alone with defendant after school while her mother and Racheal were at work. Z.L. recalled that defendant touched her vaginal area when she was approximately 12 years old. On this occasion, Z.L. came home early from school because she was in pain and was lying on the floor in the living room under a blanket near a heating vent to help her feel better. As Z.L. dozed off, she felt someone that she later identified as defendant get under the blanket, pull her pants and underwear down, and begin licking and touching her vagina. Z.L. stood up quickly, went to the bathroom and cried. Later, defendant told Z.L. not to tell anyone, but she eventually told her mother in February. Z.L. believed the incident occurred in January or February and that she told her mother in February. Z.L. and her mother moved out of defendant's home the day Z.L. reported the incidents.

¶ 10 Z.L. testified that defendant would often buy her items. However, Z.L. denied there was any friction between her and defendant regarding defendant refusing to pay for Z.L. to do things.

¶ 11 On cross-examination, Z.L. admitted that during prior CAC interviews she could not remember how old she was when the abuse started or whether defendant told her to keep quiet. On redirect examination, Z.L. stated that she was initially reluctant to tell her story because she feared being kicked out of defendant's house and not having a home. Z.L. initially withheld information during her CAC interviews because she was scared and thought it was her fault.

¶ 12 State's exhibit No. 1, a recording of Z.L.'s March 8, 2017, CAC interview, was admitted and published to the jury without objection. During the interview, Z.L. stated that on one occasion, she went hunting with defendant. On the way home, Z.L. asked defendant if they could eat at Taco Bell, and defendant stated that Z.L. would have to show him her breasts to receive food. Z.L. complied by lifting her shirt and brassiere. Defendant touched Z.L.'s breasts with his hand for approximately one or two minutes.

¶ 13        Z.L. further recalled that two to three months prior to the interview, she came home sick from school. Z.L. stated "I was under the heater, cause that's what I usually do. Then [defendant] came, then [defendant] came under and started touching my boobs and touching my private area and all that." Z.L. stated that she was in the living room and had a heater that she put under the blanket. Z.L. was wearing pajama pants. Z.L. explained that defendant touched her breasts under her shirt and touched her vaginal area under her underwear. Z.L. recalled being scared and afraid. She went to the bathroom to escape defendant. Z.L. never talked about the incident with defendant and stated that defendant never told her not to tell. Z.L. did not disclose the incident immediately after it happened because she loved her house and her family.

¶ 14        In this interview, Z.L. also recalled that she wanted to join Aerial Athletics, but it cost $180. On the way to Aerial Athletics, defendant told Z.L. that if she wanted to participate, she would have to pay him back. Z.L. took defendant's statement to mean that Z.L. would have to show him her breasts. Z.L. refused and defendant got "really, really mad." Z.L. explained that defendant started touching her breasts over her shirt, but Z.L. moved. Z.L. believed this incident occurred approximately two weeks before the interview.

¶ 15        Z.L. stated that she told her mother, Ligeia, about the abuse approximately two weeks prior to this interview. Z.L. explained that she "was at home alone for, not long, I was home like, ten minutes and I was, uh, texting my mom's friend Kiersten, so like, be like, hey, can you come and pick me up, I don't like being home alone, it's boring, nothing to do, and I was crying and so my mom took me into the laundry room, bathroom." Z.L. was relieved to tell Ligeia.

¶ 16        State's exhibit No. 2, a recording of Z.L.'s July 24, 2019, CAC interview, was also admitted and published to the jury without objection. (326) This interview focused exclusively on the incident under the blanket. During the interview, Z.L. provided additional details. Z.L.

5

stated that she was asleep under the blanket, but aware, when defendant made his way under the blanket. Defendant pulled Z.L.'s pajama pants and underwear down and licked and kissed Z.L.'s vaginal area with his tongue and mouth. Defendant put his hands around Z.L.'s vaginal area, around her hips, but was not directly touching her vagina with his hands. The touching lasted for approximately one minute, at which time Z.L. went to the bathroom. Z.L. recalled that defendant stated that he knew she liked it afterward.

¶ 17    Ligeia testified that defendant was married to her stepsister, Racheal, and that she and Z.L. lived with defendant and Racheal for approximately five years. Z.L. viewed defendant as a father figure. Sometimes, defendant watched Z.L. after school. On February 25, 2017, Ligeia and Racheal went to the laundromat. Z.L. begged Ligeia not to leave the home that day, and continually attempted to contact Ligeia at the laundromat. Finally, Ligeia picked up Z.L. from home and brought her to the laundromat. Ligeia confronted Z.L. about her argumentative behavior, and Z.L. began crying and told Ligeia she did not want to tell her what was wrong because they would get kicked out of the house. After they both entered the bathroom of the laundromat, Z.L. told her mother that defendant was touching her but refused to offer further details. Ligeia immediately left the laundromat and contacted law enforcement.

¶ 18    Ligeia denied there was any confrontation between herself and defendant concerning finances within the home. On cross-examination, Ligeia denied Z.L. told her about the abuse on February 10, 2017, and denied that she waited two weeks before contacting law enforcement.

¶ 19    Pekin police officer Danielle Keen testified that she was assigned to the case on February 27, 2017. Keen observed Z.L.'s initial CAC interview on March 8, 2017. During the interview, Z.L. was engaged and answered every question to the best of her ability. At the request of the State's Attorney's office, Keen scheduled another interview on July 24, 2019. An additional

6

disclosure that defendant had licked Z.L.'s vaginal area was made during this interview. Keen testified that at this interview, Z.L. was also engaged and answered every question. Keen stated that it was not uncommon for individuals to make multiple disclosures and described disclosure as a process. On cross-examination, Keen noted that in one of her reports, Z.L. stated that defendant was not going to help her and her mother after they moved out of the house.

¶ 20        Milsteadt, a forensic interviewer, testified that he interviewed Z.L. on March 8, 2017, at the CAC. During the interview, Z.L. was nervous, had her hands underneath her legs, and would rock back and forth. Z.L. disclosed that defendant touched her breasts and vaginal area underneath her clothing. Milsteadt conducted a follow-up interview at the CAC on June 14, 2017. Z.L. did not disclose any additional abuse during this interview. On July 24, 2019, Milsteadt conducted a third interview with Z.L., wherein Z.L. disclosed mouth to vagina contact for the first time. Milstead described Z.L.'s demeanor during this interview as more relaxed.

¶ 21        Pekin Police Detective Chad Hazelwood testified that he interviewed defendant at defendant's home on July 20, 2017. Defendant denied any sexual contact had occurred. Defendant was standoffish at first and had no warning of the interview. Defendant corroborated certain details of Z.L.'s testimony in that Z.L. was with defendant on certain occasions. Defendant said he hugged Z.L. from behind on one occasion, and his hand had laid across her chest. Defendant felt horrible afterward.

¶ 22        K.S., age 21, testified that she was a friend of defendant's children. K.S. frequently spent the night at defendant's home as a child. K.S. recalled one occasion when she attended a slumber party in defendant's living room for her twelfth birthday. K.S. slept on the couch, while Z.L. and Ligeia slept on the floor. At approximately 5 a.m., K.S. awoke to defendant pulling up her shirt and grabbing her breasts. K.S. further testified that on multiple nights throughout the years,

7

defendant touched her vagina both on top of and underneath her clothing. K.S. was terrified to come forward at the time the incidents occurred. On cross-examination, K.S. testified that she stopped visiting defendant's home when she was approximately 17 years old. K.S. did not scream on the night of the incident because she did not want Z.L. to see defendant like that.

¶ 23 B.L., age 22, testified that she was defendant's son's best friend from fourth through eighth grade. B.L. frequently spent the night at defendant's home. On one occasion, when B.L. was approximately 12 years old, defendant showed her his motorcycle in the garage. Defendant asked B.L. to pose topless on the motorcycle for photographs. B.L. agreed. However, defendant attempted to grab her breasts, so B.L. went back inside and acted like the incident did not happen. B.L. clarified that she left the garage before defendant made physical contact with her. B.L. only went to defendant's home on two occasions following the incident. B.L. disclosed the incident to a friend a few weeks later but told no one else because she was terrified of defendant and did not want to be hurt.

¶ 24 E.H., age 16, testified that she was friends with Z.L. E.H. spent the night at defendant's home in early 2017. That morning, E.H. awoke to find defendant lifting up her shirt and touching her breasts. Defendant saw Racheal coming down the stairs and "jumped back." E.H. told her grandmother and her caseworker about the incident. Additionally, E.H. disclosed the incident during an interview at the CAC. On cross-examination, E.H. recalled that the incident occurred at approximately 8 a.m.

¶ 25 At this time, the State rested, and the court denied the defense's motion for a directed verdict. Racheal was called as defense witness. Racheal testified that Z.L. and Ligeia had lived with her and defendant, off and on, for approximately 13 years. Racheal and defendant provided for Z.L. and Ligeia and paid for everything. Racheal described Z.L. and defendant's relationship

as loving. Racheal never noticed anything inappropriate occurring between Z.L. and defendant. Z.L. would stay with defendant after school 3 to 4 days per week. When Z.L. had friends stay the night, Racheal or Ligeia would monitor because Racheal did not want defendant "to be accused of something he did not do." Racheal recalled a conversation on February 11, 2017, wherein Ligeia told Racheal she was moving in with her boyfriend. Racheal told Ligeia that defendant's home was no longer a revolving door and if Ligeia left, she was not welcome back.

¶ 26    Defendant testified that he worked the weekend shift as a diesel technician for the last seven years. Z.L. and Ligeia first moved into defendant's home when Z.L. was approximately three months old. Defendant frequently watched Z.L. by himself when she was between fifth and seventh grade. Z.L. insisted on going with defendant everywhere he went. Defendant recalled taking Z.L. hunting on one occasion and going to McDonald's afterwards. Defendant denied having any inappropriate contact with Z.L. on this occasion. Defendant also denied kissing or licking Z.L.'s vaginal area when she came home sick from school. Defendant denied performing oral sex on Z.L. or touching her breasts on any occasion.

¶ 27    Defendant described his interview with a detective as prearranged and recalled telling the detective that there was a time or two when he accidentally touched Z.L. Defendant detailed one occasion where Z.L. had gotten the lead part in her choir. Defendant approached Z.L. from behind to give her a hug and congratulate her, but he accidentally touched her chest. Defendant pulled his hand away and felt badly about the situation. On another occasion, Z.L. was sitting on defendant's lap, when defendant accidentally laid his arm across her chest. Defendant felt badly and apologized.

¶ 28    Defendant testified that Ligeia and Z.L. moved out on February 11, 2017, not February 25, 2017. Defendant had a conversation with Ligeia at that time and explained to her that he

9

would not allow them to return to live at his house. One day prior, Z.L. asked defendant about a gymnastics class. Defendant told Z.L. no, but Z.L. continued to badger him. Defendant lost his temper and raised his voice to Z.L. for the first time. Defendant told Z.L. that he and Racheal were the only ones who looked out for her and that they could not continue to do so. Defendant also denied touching K.S. or taking photographs of B.L.

¶ 29 On cross-examination, defendant testified that he recalled Z.L. coming home sick from school, having a heater placed underneath her blanket, and that he and Z.L. were the only two people home at that time. Defendant again confirmed that he took Z.L. hunting and out to eat afterward.

¶ 30 At the conclusion of closing arguments, the jury retired to begin deliberations. Following deliberations, the court read the jury verdicts as follows:

"THE COURT: All right. We, the jury, find the Defendant *** not guilty of predatory criminal sexual assault of a child. We, the jury, find the Defendant *** not guilty of aggravated criminal sexual abuse as charged in Count 2 alleging sexual conduct by the Defendant touching the breast of [Z.L.]

JUROR: Wait.

THE COURT: Is there—well, I'm going to finish, and then we're going to see if anybody would like to poll the jury. We, the jury, find the Defendant *** not guilty of aggravated criminal sexual abuse as charged in Count 3 alleging sexual conduct by the Defendant touching the hips and genital area of [Z.L.] Would anyone like to poll the jury?

[THE STATE]: The People are requesting the jury be polled, Your Honor.

10

JURY FOREMAN: Your Honor, can I say something? There should be a sheet in there—the one wasn't read correctly, I don't think.

THE COURT: Okay. Well, I'm going to have you retire to the jury room. I'm going to have all of the jurors go back to the jury room.

(Jury left the courtroom at 4:54.)

THE COURT: How would you like me to handle this?

[DEFENSE COUNSEL]: I don't even know what is going on, to be honest with you.

[THE STATE]: I can say—I assume that the Court read the documents in front of herself correctly.

THE COURT: I did.

[THE STATE]: And it appears from their reaction that there is some discrepancy between what they thought that they signed and what was read aloud in court.

I would think hopefully that polling the jury would rectify that mistake or misunderstanding, and we could start with that, and if for some reason they don't understand the question or they need clarification, we could go from there on the record. That would be the People's recommendation.

THE COURT: That's what I think we should do, too. I think we should poll them and take it from there, but I do not think that there should be any kind of discourse in front of us about any issue.

[THE STATE]: Agreed.

11

[DEFENSE COUNSEL]: Can we see the notes, because apparently they say that there was a note on—

THE COURT: There's no note. There's no note.

[DEFENSE COUNSEL]: Okay.

[THE STATE]: That's why—I agree, I don't think there should be any dialogue back and forth between anything that happened in the jury room.

THE COURT: So I think we should poll them, and then depending on what happens there, we'll send them back to the jury room, depending on what we learn by the poll. Is everybody good with that?

[DEFENSE COUNSEL]: Yes.

[THE STATE]: Yes.

THE COURT: For the record, here are—I mean, I have all six jury verdict forms, and the only ones that are signed are the not guilty jury verdict forms, so let's bring them back in and we'll see what happens next. For the record, I'm not going to allow them to comment other than to answer the question as posed by [the clerk].

[THE STATE]: That yes or no answer.

THE COURT: Correct.

(Jury brought back into the courtroom.)

THE COURT: Okay. For the record, and I only want all of you to answer [the clerk] with a yes or no answer, all right, so we're going to poll all of you. You may proceed."

¶ 31　　　　All 12 jurors were individually asked "[w]as this and is this now your verdict" for each individual count. The jurors individually confirmed that their verdict was read correctly for counts I and III but answered "[n]o" for count II. The jury again exited the courtroom, and the court commented that it was clear the jury mistakenly found defendant not guilty of count II. Defense counsel moved for a judgment notwithstanding the verdict. Following a brief recess, defense counsel requested a mistrial as to count II, or in the alternative, that the original verdict stand. The court commented that after it read count II, the jurors looked befuddled and based upon their responses during polling, the court was inclined "to send the jury back out for further deliberation with new verdict forms on Count 2 only with the instructions as it relates to Count 2 only." The court instructed the jury accordingly, and 10 minutes later, the jury found defendant guilty of count II. The jurors were polled and individually confirmed their verdict.

¶ 32　　　　On October 20, 2020, defendant filed a motion for judgment notwithstanding the jury's amended verdict. Defendant's motion argued that the trial was concluded once the court read the not guilty verdict on count II and that double jeopardy principles barred further prosecution at that point. The court denied defendant's motion, reasoning that jurors must be able to express disagreement during polling or else the polling process would be a farce. The court also found that it was clear the jury had signed the wrong verdict form. The court further denied defendant's motion to reconsider on a later date. Defendant appeals.

¶ 33　　　　　　　　　　　　　　　II. ANALYSIS

¶ 34　　　　　　　　　　　　　　A. Double Jeopardy

¶ 35　　　　Defendant first argues he was unlawfully subjected to double jeopardy. Defendant contends that the court's reading of the jury's signed not guilty verdict on count II, regardless of any apparent mistake, resulted in acquittal and the immediate attachment of double jeopardy

13

protections. The State argues that double jeopardy concerns were not implicated here, where the jury's finding did not result in an acquittal. Because this issue concerns the application of law to uncontested facts, our review is *de novo*. *People v. Cervantes*, 2013 IL App (2d) 110191, ¶ 22.

¶ 36 Under the United States Constitution, the Illinois Constitution, and the Criminal Code of 2012, no person shall be twice placed in jeopardy for the same offense. U.S. Const., amend V.; Ill. Const. 1970, art. I, § 10; 720 ILCS 5/3-4(a) (West 2020). This bar against double jeopardy guarantees three basic protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. *People v. Milka*, 211 Ill. 2d 150, 170 (2004). Indeed, the State is prevented from making repeat attempts to convict an individual of the same crime and thereby subjecting that individual to continued embarrassment and expense, *inter alia*. *Green v. United States*, 355 U.S. 184, 187-88 (1957). "Regardless of the context, the protection against double jeopardy only applies if there has been some event that terminates the original jeopardy." *People v. Ventsias*, 2014 IL App (3d) 130275, ¶ 13. Such an event may occur, for instance, when a defendant is unequivocally found not guilty. *People v. Williams*, 188 Ill. 2d 293, 307 (1999); *People v. Henry*, 204 Ill. 2d 267, 284 (2003).

¶ 37 In support of his claim, defendant cites to *People v. King*, 17 Ill. App. 3d 1064 (1974). In *King*, the jury returned not guilty verdicts on two of several charges. *Id.* at 1065. The court found the not guilty verdicts to be inconsistent with the guilty verdicts, refused to accept them, and sent the jury back with instructions to find consistent verdicts. *Id.* After further deliberations, the jury was unable to do so, and the court *sua sponte* declared a mistrial on all counts. *Id.* On appeal, this court held that the jury "affirmatively found the defendant not guilty on Counts III and IV." *Id.* at

14

1066. We further reasoned that the jury's affirmative determination amounted to an acquittal, rendering the court's subsequent declaration of a mistrial, error. *Id.* at 1067.

¶ 38    Though relevant, *King* is minimally instructive insofar as it offers a limited analysis on the finality of a not guilty finding and few factual details to support its conclusions of an affirmative not guilty finding. Unlike *King*, the question here is not the effect of the not guilty finding, but rather, whether the trier of fact actually made this finding.

¶ 39    On this point, we find the facts in *Williams* and *Henry*, and our supreme court's analyses of the differing factual scenarios presented in those cases, instructive. At the close of the State's case in *Williams*, the defendant moved for a directed finding of not guilty. *Williams*, 188 Ill. 2d at 298. The court granted the motion and entered a finding of not guilty as to the armed robbery charge. *Id.* However, in the same breath, the court indicated that it was not ready to rule on the motion and that she would accept the submission of legal authority. *Id.* at 299. The next day, after reviewing relevant authority, the court denied the defendant's motion for a finding of not guilty as to the armed robbery charge. *Id.*

¶ 40    Based on these facts, our supreme court characterized the issue as "not the effect of a finding of not guilty, but rather, whether the trial court in fact made this finding." *Id.* at 301. In affirming the defendant's armed robbery conviction, our supreme court found that even though the court initially announced a not guilty finding, the finding was equivocal, based on the totality of the circumstances. *Id.* at 306. The *Williams* court noted that double jeopardy concerns were not implicated where the court's ruling was not postponed, the State did not present additional evidence of the defendant's guilt, and the defendant was not subjected to the harassment of successive prosecutions. *Id.* at 307.

¶ 41    *Henry* presents a contrasting factual scenario. *Henry*, 204 Ill. 2d 267. In *Henry*, defense counsel moved for a directed verdict on the aggravated battery charge at the close of evidence. *Id.* at 271-72. The court granted the defendant's motion for a directed verdict, and the State immediately requested leave to appeal. *Id.* at 272. After a recess, the court vacated its order and reserved ruling on the motion for a directed verdict. *Id.* at 273. After another recess, the State provided the court with case law that swayed the court to deny the defendant's motion for a directed verdict. *Id.* at 274. The defendant was ultimately convicted of the aggravated battery charge. *Id.* at 275.

¶ 42    In reversing the defendant's conviction, the *Henry* court distinguished these facts from those presented in *Williams*. *Id.* at 284-88. The court reasoned that unlike in *Williams*, the trial court did not state that she would grant the defendant's motion, and then in the same breath, invite the parties to submit legal authority and offer to hold the ruling in abeyance. *Id.* at 286. The *Henry* court also pointed to the fact that the discussions following the court's ruling "focused solely upon the propriety and the procedure of appealing the court's ruling," which indicated the parties' understanding that the court had unequivocally entered a not guilty finding. *Id.* at 287.

¶ 43    Though the facts of the instant case involve the reading of a jury verdict, rather than a directed finding, we still find *Williams* analogous. Here, the court's reading of the not guilty verdict on count II resulted in immediate and apparent juror confusion. One juror commented "Wait," then, the juror foreperson stated, "the one wasn't read correctly, I don't think." The court instructed the jury to exit the courtroom, at which time the parties also exhibited confusion, with defense counsel commenting "I don't even know what is going on, to be honest with you." The parties agreed to have the jury brought back into the courtroom and polled. After polling, all 12

16

jurors indicated that they did not return a not guilty verdict on count II. Accordingly, the court directed the jurors to retire for further deliberations and the jury subsequently returned a guilty verdict on count II.

¶ 44 Under these circumstances, the court's reading of the not guilty verdict did not amount to an unequivocal not guilty finding, such that defendant was acquitted of the offense. We base our finding on the immediacy of the juror responses, the parties' reactions thereafter, and the results of the individual polling. Like in *Williams*, the cornerstone of the double jeopardy clause was not implicated in this case where the proceedings were not postponed, the State was not allowed to present additional evidence of defendant's guilt, and defendant was not subjected to the harassment of multiple prosecutions.

¶ 45 Our finding is further bolstered by our supreme court's holdings in *People v. Almo*, 108 Ill. 2d 54, 63 (1985) and *People v. Kellogg*, 77 Ill. 2d 524, 528 (1979). In *Almo*, the defendant argued that in effect, the trial was over the moment the verdict forms were returned by the jury with the word "guilty" written on them, and that anything that took place thereafter was a nullity. *Almo*, 108 Ill. 2d at 63. The *Almo* court flatly rejected the defendant's argument, instructing that a jury finding does not become the verdict until it is received, accepted by the court, and entered of record. *Id.* (citing *People v. Wilson*, 51 Ill. 2d 302, 309 (1972)). During this process, it is the trial court's duty to review the verdict and to determine whether it is proper in both form and substance. *Id.* If an issue arises, it is the duty of the trial court to preserve the integrity of the trial, which may encompass an instruction to the jury to continue deliberating. See *id.*

¶ 46 With further regard to the finality of a jury verdict, in *Kellogg*, our supreme court provided guidance concerning the polling of jurors. *Kellogg*, 77 Ill. 2d 524. The *Kellogg* court observed that before the final verdict is recorded, a juror must have the right to express to the

17

court that a mistake has been made, which may include a reconsideration of his or her verdict or an express disagreement with the verdict returned. *Id.* at 528. The court reasoned that if jurors were not empowered to express these thoughts, the polling process would be a farce and the jury would be bound by their signatures on the verdict form. *Id.* Thus, the court instructed that if a juror dissents from the verdict, the proper remedy is for the court, on its own motion, if necessary, to either direct the jury to conduct further deliberations or to discharge the jury. *Id.* at 528-29.

¶ 47    The court in this case had a duty to preserve the integrity of the trial by ensuring the accuracy of the jury verdict before recording the verdict as final. In so doing, the parties agreed to poll the jury. After confirming that the jury had, in fact, mistakenly signed a jury form which represented that the jury had found defendant not guilty of count II, the court instructed the jury to retire to continue deliberations in accordance with the case law. Under such circumstances, the jury never returned an unequivocal not guilty finding, especially where the jury had yet to be polled. Double jeopardy concerns were not implicated in this case.

¶ 48                                    B. Erroneous Admission of Out-of-Court Statement

¶ 49    Next, defendant argues that the court erred in admitting Z.L.'s July 24, 2019, videotaped interview, because the out-of-court statement was inadmissible under section 115-10(b)(3) of the Code in that this hearsay section requires that the child be under 13 years old when the statement is given. 725 ILCS 5/115-10(b)(3) (West 2018). The State agrees that this statement was clearly inadmissible, as it is undisputed that several years had passed since the incident, and Z.L. was 14 years old at the time of the interview. Based on these facts, we accept the State's concession

¶ 50    Defendant acknowledges that defense counsel did not oppose the admission of the out-of-court statement on these same grounds prior to trial. The record further reflects that counsel

18

neither raised a contemporaneous objection to the admission of the statement at trial nor included argument on the issue in a posttrial motion. For this reason, defendant asks that we review this issue as plain error or ineffective assistance of counsel. The plain error doctrine allows reviewing courts to address forfeited errors where clear and obvious error occurred and (1) the evidence is closely balanced, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 187 (2005); *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In this instance, defendant has elected to proceed under the first prong. That is, defendant argues the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *Piatkowski*, 225 Ill. 2d at 565.

¶ 51 Plain error review under the closely balanced evidence prong is similar to an analysis for ineffective assistance of counsel based on an evidentiary error in that a defendant in either case must establish prejudice. *People v. White*, 2011 IL 109689, ¶ 133 (instructing that a defendant must show there was a reasonable probability that the outcome of the proceeding would have been different had the evidence in question been excluded to establish ineffective assistance); *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Thus, having recognized that the court committed error in admitting the statement, we focus our analysis on the nature of the evidence presented at trial and whether defendant's trial boiled down to a credibility contest, such that a different result may have been reached but for the improper admission of the out-of-court statement. See *People v. Naylor*, 229 Ill. 2d 584, 606-09 (2008) (finding the evidence to be closely balanced where credibility was the only basis upon which defendant's guilt or innocent could be decided).

¶ 52 Count II alleged that defendant committed aggravated criminal sexual abuse in that he knowingly touched Z.L.'s breasts with his hands for the purpose of defendant's sexual

gratification. Defendant stipulated to the requisite ages of both himself and Z.L. at trial, leaving the jury to determine whether defendant knowingly touched Z.L.'s breasts with his hands for the purpose of sexual gratification. In support of the State's allegation, Z.L. testified that defendant touched her breasts on multiple occasions, including once in defendant's vehicle after a hunting trip. Defendant's testimony corroborated Z.L.'s testimony where defendant recalled he was frequently alone with Z.L., which included the occasion when he and Z.L. went hunting. Defendant also corroborated Z.L.'s testimony that he became angry when he discussed Aerial Athletics with Z.L. Aside from a discrepancy regarding whether Z.L. asked defendant to eat at McDonald's or Taco Bell, Z.L.'s recollection of the incident at trial was remarkably consistent with the statements given during the video-recorded interview on March 8, 2017. Though more than three years had passed since that time, Z.L. gave confident, detailed, testimony at trial. This, in and of itself, is indicative of reliability.

¶ 53 Moreover, Z.L.'s testimony was heavily bolstered by the testimony of K.S., B.L., and E.H., while defendant's testimony was contradicted. The jury was instructed that they were entitled to consider, and assign weight to, K.S., B.L., and E.H.'s testimony as it related to defendant's propensity to commit the instant offenses. These three young women testified that defendant either touched, attempted to touch, or asked them to expose their breasts. The similarity between the relevant facts and circumstances of these accounts and Z.L.'s account was striking. We are further struck by defendant's wife's testimony that when Z.L. had friends stay the night, she would not leave defendant alone with the children because she did not want defendant "to be accused of something he did not do."

¶ 54 Defendant argues that the jury's not guilty findings on counts I and III dealt a considerable blow to Z.L.'s credibility as it pertained to the intentional touching of Z.L.'s breasts

as alleged in count II. We disagree. In count I, the State alleged contact between defendant's mouth and Z.L.'s vagina. In count III, the State alleged that defendant touched Z.L.'s hips and genital region with his hands. The allegations in count I arose from the statements made during Z.L.'s July 24, 2019, interview, more than two years after the incident, while the allegations in count III arose from both the March 8, 2017, and the July 24, 2019, interviews. Both counts focused on the alleged incident that occurred under the blanket in the living room. During the March 8, 2017, interview, Z.L. alleged defendant touched her breasts and vagina with his hands and told her not to tell. During the July 24, 2019, interview, Z.L. alleged that defendant put his hands on her hips and his mouth made contact with her vaginal area but he did not touch her vagina or breasts with his hands. At trial, Z.L. testified that defendant's mouth made contact with her vagina with both his hands and mouth. However, Z.L. did not recall defendant touching her breast or telling her not to tell anyone about the incident.

¶ 55        As such, it appears the jury's not guilty findings on counts I and III were particularized to the alleged incident in the living room and not the touching of Z.L.'s breasts in the car. It is reasonable to infer that the timing of Z.L.'s additional disclosures, coupled with Z.L.'s conflicting statements about the incident, gave rise to juror skepticism. Under these circumstances, Z.L.'s credibility concerning the incident where defendant touched her breasts outside of the home was not damaged.

¶ 56        It is well accepted that it is the function of the trier of fact to assess the credibility of witness, to determine the appropriate weight of the testimony, and to resolve conflicts or inconsistencies in the evidence. *People v. Evans*, 209 Ill. 2d 194, 211 (2004). In convicting defendant, this jury clearly decided it was not faced with two credible versions of events. Accordingly, the evidence was not closely balanced. For these reasons, defendant fails to

establish prejudice where the evidence was neither closely balanced nor was there a reasonable probability that the trial outcome would have been different had the contested evidence not been admitted. Defendant's convictions are affirmed.

¶ 57                                                          III. CONCLUSION

¶ 58          The judgment of the circuit court of Tazewell County is affirmed.

¶ 59          Affirmed.